CAMDEN SPECIAL ROAD DISTRICT OF RAY COUNTY, Missouri, Respondent,

v.

Virgil TAYLOR and Hannah Taylor, Appellants.

No. KCD 26030.

Missouri Court of Appeals, Kansas City District.

May 7, 1973.

A. G. Cameron, Richmond, for appellant.

McCalley & Calvin, A. V. McCalley, Richmond, for respondent.

Before DIXON, C. J., PRITCHARD and SOMERVILLE, JJ., and WILLIAM J. MARSH, Special Judge.

SOMERVILLE, Judge.

Plaintiff, Camden Special Road District of Ray County, Missouri, hereinafter referred to as "Road District" filed an equitable action against Virgil Taylor and Hannah Taylor, hereinafter referred to as "Taylors". The Road District alleged in its petition: (1) it was a Special Road District organized and existing under the provision of Chapter 233 RSMo 1969; (2) within its boundaries there existed a public road, running north and south, under its supervision and control; (3) Taylors owned land lying west and adjoining its public road; (4) prior to September 21, 1970, Taylors constructed a levee running east and west, across the north boundary of their land, thereby "completely blocking

the natural flow of water from the north to the south and causing the water to back up onto and across said public road"; (5) water was caused to stand on the public road, starting September 21, 1970, and "was still standing on the public road on February 10, 1971, the date it filed its petition"; (6) water standing on the public road prevented the general public from using the public road; and (7) construction of the levee by Taylors, thereby impounding water on the public road, constituted a public nuisance and the Road District had no adequate remedy at law for relief.

The Road District prayed for a mandatory injunction compelling Taylors to remove the levee, and, further, that Taylors be permanently enjoined from constructing a levee on their land which would "bar or impede the flow of water in the area of said public road."

Taylor's answer to Road District's petition was a general denial plus laches and bar by Section 516.410 RSMo 1966.

Trial by court ensued and judgment for Road District was entered as follows: ". . . that plaintiff is entitled to the relief prayed and orders and rules that defendants be and they are enjoined from maintaining the levee or roadway across the north end of said lands owned by them, and described in the petition in such manner as to obstruct plaintiff's road which runs north-south along the east side of such tract owned by defendants." From this judgment Taylors duly perfected their appeal.

■ In court tried equity cases, an appellate court is impressed with the duty of reviewing the case de novo upon both the law and evidence, giving due deference to the opportunity afforded the trial court to judge the credibility of the witness and of not disturbing the judgment of the trial court unless clearly erroneous. Franke v. Franke, 447 S.W.2d 308 (Mo.1969).

With minor exceptions, none of which are critical to the disposition of any issue, the controlling facts are undisputed. In 1946, Taylors, as tenants by the entirety, acquired fifty-five acres of land lying west of and adjoining the north-south public road. The public road was within and subject to the control and supervision of Road District. The topography of Taylors' land was irregular, high on the east side along the north-south public road, low in the middle, and high on the west side. The topography of the land north, east and northeast of Taylors' land was "flat and wide" and "swampy". Surface water in the general area east of the public road and northeast of Taylors' land diffused, direction-wise, from northeast to southwest, thence southwesterly across the public road at a point at least eight hundred feet north of the northeast corner of Taylors' land, thence across land north of and adjoining Taylors' land, thence southwesterly onto Taylors' land with the end result being inundation of the low central area of Taylors' land. This inundation created a "pot-hole" or "lake" in the low central area of Taylors' land. The volume of surface water was accelerated at flood stage by the overflow of Rollins Creek, which was some distance east of the public road and northeast of Taylors' land. Rollins Creek ran east to the "river". There was a levee paralleling the south side of Rollins Creek. The greater part of surface water so diffusing came from a watershed lying east and northeast of the public road, and from the overflow of Rollins Creek at flood stage.

Some time prior to 1946, Taylors' predecessor in title constructed a private road along the north edge of Taylors' land, approximately eighteen inches to two feet in height, in order to traverse the low central area that was inundated with surface water and thereby make the high ground on the west side accessible for farming. When the volume of surface water was accelerated by the overflow of Rollins Creek, surface water would run across the private road on Taylors' land over an expanse of approximately one-eighth of a mile.

In 1950 the owner of the land east of the public road and northeast of Taylors' land, together with the tenant of the land north of and adjoining the Taylors' land, secured permission from Taylors to install a culvert, constructed of railroad ties, under the private road, which permitted the surface water to diffuse under the private road and onto the low central area of Taylors' land. In 1954, the same parties, absent permission from the Taylors, replaced the culvert constructed out of railroad ties, with a concrete culvert twelve inches in diameter and four sections in length. In the spring of 1970 Taylors engaged persons and machinery to raise the elevation of their private road to a height of approximately five feet, and, additionally, constructed a levee at the east end of the private road, which extended south for a distance of approximately one hundred feet. This made the elevation of the private road (referred to in Road District's petition as "levee") higher than the elevation of the public road at a point approximately eight hundred feet north of the northeast corner of Taylors' land. At the same time Taylors constructed a bar pit on the south side of their private road. The private road and the levee running south therefrom were entirely on Taylors' land and no part thereof encroached on the adjoining land to the north or any part of the public road to the east. When elevation of the private road on Taylors' land was raised in the spring of 1970, one section of the concrete culvert was removed and the void created was filled solidly with dirt and the remaining sections of the concrete culvert were covered with dirt. The combined effect of removing the section of concrete culvert and raising the elevation of the private road completely stopped the diffusion of surface water on to Taylors' land. As a corollary the "pot hole" or "lake" in the low central area of Taylors' land substantially dried up and additional acreage was made suitable for agricultural purposes.

Several days prior to September 21, 1970, nine inches of rain fell in the short period of two or three days. Rollins Creek went out of its banks and water overran the levee paralleling the south side of Rollins Creek. The southwesterly diffusion of the resultant surface water was stopped by the elevated private road extending across the north side of Taylors' land. The east "side ditch" of the public road was filled with mud and there was no "side ditch" on the west side of the public road. Eventually, the surface water stopped by Taylors' private road reached a level where it stood on the public road for a distance of "a little less than a quarter of a mile", starting approximately eight hundred feet north of the northeast corner of Taylors' land, thence extending north. The water so standing on the public road was described as "dead water". At the deepest point the water standing on the public road was colloquially described as "going over five buckle overshoes", or approximately sixteen inches in depth. Water stood on the public road from on or about September 21, 1970, until on or about April 13, 1971. Limited traffic continued to use the public road until the latter part of December, 1970. Limited traffic so using the public road "cut up" the water soaked roadbed and made it "impassable". The Road District closed the road to traffic the latter part of December, 1970, and reopened it in April, 1971, at which time the roadbed was built up by spreading "four inch rock".

Prior to 1970 surface water stood on the public road in the area starting approximately eight hundred feet north of the northeast corner of Taylors' land during periods of heavy rain, but not to such an extent that the public road had to be closed.

While the public road was closed from the latter part of December, 1970, to the early part of April, 1971, the rural mail route that had used the road was detoured, causing the rural mail carrier to travel an additional 1.65 miles; a school bus was rerouted incurring a minimal increase in mileage. The tenant on the east side of

the public road was required to travel additional mileage to get to and from his feed lot.

The Road District does not contend that it had an easement or prescriptive right for surface water from the public road to diffuse onto Taylors' land. Equally important, the Road District does not contend that the private road along the north side of Taylors' land obstructed or crossed a natural water course. All of the evidence patently disclosed that the surface water standing on the public road circuitously resulted from the private road, in that it "backed water" on the public road, "held the water back" over the public road, or "held water on the road". There is not one scintilla of evidence characterizing the effect of Taylors' private road as "turning water" on to or upon the public road.

Taylors assert an unqualified right to so construct and maintain their private road by reason of the "common enemy doctrine" (common law rule) apropos to surface water. Road District asserts (1) the private road created a public nuisance, or, in the alternative, (2) the following contained in Section 229.150 RSMo 1969, "Any person or persons who shall willfully or knowingly obstruct or damage any public road . . . *by turning water upon such road or right of way* . . . or shall obstruct said road, highway or drains in any other manner whatsoever, shall be deemed guilty of a misdemeanor . . ." (Emphasis added.), was violated by Taylors and the referred to language constitutes a statutory exception to the "common enemy doctrine" when a public road is involved.

After some vacillation, Missouri in 1884, Abbott v. K. C., St. J. & C. B. Ry. Co., 83 Mo. 271, repudiated the "civil law" rule and firmly committed itself to the "common enemy doctrine" regarding surface water, the doctrine therein finding expression in the following language, 1. c. 283: " 'But in the case of surface water, which is regarded as a common enemy, he is at liberty to guard against it or divert it from

his premises, provided he exercises reasonable care and prudence in accomplishing that object.'" Subsequent judicial history of the "common enemy doctrine" in Missouri discloses that well defined principles have been carved with respect both to guarding against and diverting surface water, throughout which, on the other hand, the import and application of the language, provided one "exercises reasonable care and prudence" in doing so, has, at best, been vague and obscure, insofar as directly relating to the hard core thrust of the "common enemy doctrine". This opacity of the law, or perhaps more appropriately "muddying of surface water", resulted from a failure to clearly discern that the "common enemy doctrine" applied solely to surface water in its natural diffused state, not after it was artificially collected and accelerated in volume. Consequently, the mentioned proviso has, judicially and textwise, been improperly referred to as a modification of the "common enemy doctrine". Such constitutes more of a play on words than substance. In Rychlicke v. City of St. Louis, 98 Mo. 497, 11 S.W. 1001 (1889), it was held the owner of the dominant tenement could not, by impoundment or artificial ditching, discharge surface water onto the servient tenement in accelerated volume. As early as 1908, it was held, likewise, the owner of the servient tenement could not, by impoundment or artificial ditching, discharge surface water onto the dominant tenement in accelerated volume. Mehornay v. Foster, 132 Mo.App. 229, 111 S.W. 882 (1908). The court in Mehornay, supra, very carefully pointed out, however, that raising the level of the servient tenement, thus stopping the flow of surface water onto the servient tenement, did not do violence to the "common enemy doctrine" prevailing in Missouri. This principle found even greater clarity of enunciation in Walther v. City of Cape Girardeau, 166 Mo.App. 467, 149 S.W. 36 (1912), 1. c. 38: "If it could be held that because the owner of the lower estate, in protecting his own property against surface water, is liable in damages

as for a nuisance because of the stoppage of the flow of surface water over his property, *then the whole doctrine upon which the right of stoppage of surface water is based would be overthrown.*" (Emphasis added.)

Goll v. Chicago & A. Ry. Co., 271 Mo. 655, 197 S.W. 244 (1917), clearly vindicated the right of the owner of the servient tenement to stop the flow of surface water by levee or embankment and that doing so, as such, contained no elements of "negligence or unskillfulness" at common law. The term "negligence or unskillfulness" as used is obviously synonymous to "reasonable care and prudence". Goll v. Chicago & A. Ry. Co., supra, also held "overflow" water from streams and rivers was surface water. See also Schalk v. Inter-River Drainage Dist., 226 S.W. 277 (Mo.App. 1921). Anderson v. Inter-River Drainage and Levee Dist., 309 Mo. 189, 274 S.W. 448 (1925) reaffirmed Missouri's allegiance to the doctrine that the owner of the servient tenement could, by levee or embankment, ward off surface water with immunity. See also City of Hardin v. Norborne Land Drainage Dist., 360 Mo. 1112, 232 S.W.2d 921 (1950).

In Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118 (1937), the court quoted with approval the following declaration of the so-called modified "common enemy doctrine" prevailing in Missouri as delineated in Schalk, supra, 226 S.W., l. c. 278: " 'The law seems to be well settled in Missouri that surface water is a common enemy which every man may ward off his land and thus throw it on an adjacent or lower owner, provided he does not, in warding it off, unnecessarily collect it and discharge it to the damage of his neighbor.' "

The case of Casanover et al. v. Villanova Realty Co., 209 S.W.2d 556 (Mo.App. 1948), holds that the owner of the dominant tenement can, with immunity, in dealing with surface water, alter the grade of the dominant tenement so long as the surface water is not accelerated in volume onto the servient tenement by impoundment or artificial ditching.

The case of Gibson v. Sharp, 277 S.W.2d 672 (Mo.App.1955), pronounces Missouri's so-called modified "common enemy doctrine" in terms of "a landowner may dam against surface water even though in doing so he casts it back upon his neighbor" provided he does not "gather it and discharge it at one place to the injury of an adjoining owner."

Haferkamp v. City of Rock Hill, 316 S.W.2d 620 (Mo.1958) and Reutner v. Vouga, 367 S.W.2d 34 (Mo.App.1963), as well as the cited cases chronologically tracing Missouri's judicial history of the "common enemy doctrine", support the undisputable conclusion that the proviso attached to guarding against or diverting surface water, that one "exercises reasonable care and prudence" in doing so (Abbott, supra), does not, in any way, modify or limit the basic and inherent right constituting the heart and core of the "common enemy doctrine" that a landowner may ward off surface water even though in doing so he damages his neighbor. The proviso, that one "exercises reasonable care and prudence" in doing so (Abbott, supra), lends itself solely to and prohibits unnecessarily collecting and discharging surface water to the damage of an adjoining owner. Unyielding to semantic aphasia, the referred to proviso does not limit or modify the "common enemy doctrine" prevailing in Missouri with respect to surface water, but rather it enunciates a unique and limited factual situation to which the "common enemy doctrine" has no application.

The Taylors, in raising the elevation of their private road and removing the concrete culvert, even though the indirect result of doing so was to back surface water on the public road, were cloaked with legal immunity by virtue of the "common enemy doctrine", unless such lawful use of

their land constituted a public nuisance or Section 229.150, supra, be deemed to constitute an exception to the "common enemy doctrine" when a public road is involved.

Attention is first focused on whether Taylors' lawful use of their land, the indirect result of which was to cause surface water to back on to the public road, constituted a public nuisance. In J. Angell, A Treatise on the Law of Watercourses, 7th Ed., page 136, Section 108m, with reference to jurisdictions subscribing to the common enemy doctrine, the following principle is articulated: " ' . . . The public have no greater right to restrain him in the use of his land than they would have had if they had been absolute owners of the land included in the highway. They may raise the level of their travelled path, and do not violate his rights if the effect of their act is to cause the surface water to flow upon his land. *And he may also raise his land, or may erect upon it a building or other structure which shall prevent this effect without violating their rights.'* " (Emphasis added.)

The defendant in State v. Campbell, 80 Mo.App. 110 (1899), was criminally indicted for a common law offense predicated upon the creation of a public nuisance upon his land which resulted in reversing the flow of surface water thereby wearing a "gully" in a public road. The court held there was not sufficient evidence to sustain Campbell's conviction because all affirmative acts charged and complained of occurred solely on his land and none occurred on any part of the public road or right of way.

Other jurisdictions, where the "common enemy doctrine" prevails, have judicially ruled that public roads are not sacrosanct and that adjoining landowners have the right to levee or embank against surface water flowing from them. Morrison v. Bucksport & Bangor Railroad Company, 67 Me. 353 (1877); Kennison v. Inhabitants of Beverly, 146 Mass. 467, 16 N.E. 278 (1888).

Construction of the private road by the Taylors, which circuitously turned back surface water on the public road, did not constitute an abatable public nuisance by reason of the "common enemy doctrine". This conclusion focuses attention on Road District's alternative contention that Taylors violated Section 229.150, supra, and that the statute abrogates the "common enemy doctrine" with respect to public roads.

Section 229.150, supra, is a criminal statute and must be construed accordingly. Such statutes are strictly construed with respect to subjecting persons within their purview and subjection cannot arise by implication. State v. Taylor, 345 Mo. 325, 133 S.W.2d 336 (1939); State v. Getty, 273 S.W.2d 170 (Mo.1954); State v. Wilbur, 462 S.W.2d 653 (Mo.1971).

The statute in question makes it a misdemeanor to obstruct a public road "by turning water upon such road" or by obstructing a public road "in any other manner whatsoever". Road District takes the position that part or all of the specifically referred to statutory language abrogates the "common enemy doctrine" applicable to surface water and Taylors violated the statute. Figuratively speaking, this contention of Road District is a legal sieve and does not hold water for a number of reasons. Webster's Third New International Dictionary defines *turn on* "to cause to flow by or as if by opening a valve or tap" and *turn back* "to stop going forward". The private road constructed by the Taylors did not turn surface water onto the public road, rather it turned back or stopped surface water from going forward in the course of its natural diffusion. The language of the statute "by turning water upon such road" appears to lucidly incorporate the so-called modification of the "common enemy doctrine" that a landowner may not accelerate the flow of surface water onto another's property as a result of impoundment or artificial ditching, neither of which occurred under the undisputed facts of the instant case.

 The general language contained in the statute, supra, "in any other manner whatsoever" following, as it does, specifically enumerated acts which constitute obstruction of a public road, is of no avail to support Road District's contention that the statute abrogated the "common enemy doctrine" and Taylors violated the statute. It is a fundamental maxim that general language, following specifically enumerated acts, is construed to refer to acts of the same kind or class. State v. Getty, supra. "Turning water on" and "turning water back" are two distinctly separate and different acts. Section 229.150, supra, does not dichotomize the "common enemy doctrine" prevailing in Missouri.

Reverberations of Road District's alternative contention, if successful, would echo up and down the river and creek valleys of this state like never ending clashes of thunder. Taylors' land was once removed from the area of the public road where the surface water stood by intervening land owned by another lying north of and adjacent to Taylors' land. Academically, how many times can land be removed from the situs of the crime and the owner still be criminally liable if Road District prevailed in its contention that Section 229.150, supra, abrogated the "common enemy doctrine"; how can one be held criminally liable where the unpredictability of a happenstance of nature, a torrential downpour, necessarily has to be an active participant in the criminal act; how can Road District escape the irrefutable conclusion that the end result is to place a financial burden on the Taylors regarding maintenance of the public road that is not borne by any other landowner in the district; how can Road District justify proceeding against the Taylors and not proceeding against the landowner adjoining the public road on the east and northeast, which was the site of the watershed and Rollins Creek, from whence came the majority, if not all, of the surface water that stood on the public road? Fortunately, these incongruities need not be resolved. As a matter of law

the judgment of the court below was clearly erroneous. As an aside, it would appear Road District can alleviate its problem by raising the level of the public road approximately sixteen inches in the inundated area, by opening the "side ditch" on the west side of the public road and by constructing a "side ditch" on the east side of the public road, thereby spreading the costs fairly and proportionately among all the landowners in the district.

The judgment below is reversed and the injunction dissolved. Judgment in favor of defendants is hereby entered, with costs taxed against plaintiff.

All concur.