GEORGE A. YOUNG, MAX A. JAMES, MINNIE SCOWDEN, LOWELL STEVENS, RALPH TOWNSEND AND DONA TOWNSEND, CHARLES HAWKINS AND LULA HAWKINS, VERNON MILLER, AND IRENE MILLER, AND ROY C. SNIDER AND MAYME SNIDER, RESPONDENTS v. W. J. (JAKE) MOORE AND NELLIE B. MOORE, APPELLANTS.—236 SW (2) 740.

Springfield Court of Appeals.   February 21, 1951.

*James A. Finch, Jr., Finch* and *Finch* for Appellants.

*J. Grant Frye, Gerald B. Rowan* for Respondents.

438

VANDEVENTER, P. J.—This is an action in equity seeking to enjoin the defendants from permitting water on their farm to flow through a man-made ditch into Cypress Slough and thence onto the lands of the plaintiffs to their damage. From a decree, partially enjoining them, the defendants have appealed.

This being an equity case, it is heard by this court de novo upon the record and it is our duty and responsibility to render such decision as we think the evidence warrants and the court below should have rendered, giving due deference to the decision of the chancellor, who had the advangage of observing and hearing the witnesses as they testified. Rucker v. Fowler (Mo. App.) 233 S. W. (2) 809, Bowman v. Kansas City (Mo. Sup.) 233 S. W. (2) 26. Handlan v. Handlan (Mo. Sup.) 232 S. W. (2) 944.

Plaintiffs' first amended petition, upon which the case was tried, after describing the various real estate holdings of the parties, states that the natural flow and drainage of surface waters, which collect on the land of defendants, was toward the south and east and away from the land of plaintiffs and that the land of plaintiffs was protected from the drainage of surface water from defendants' land by a natural ridge, higher than the surrounding terrain, which ridge ran across defendants' land; that in July, 1948, defendants caused to be constructed certain ditches through the natural ridge that protected their land from surface water, which caused such water to be discharged upon the land of one Nathan Sims in greatly increased volume, and from there to flow in a southwesterly direction onto the land of plain-

tiffs to their damage, on some by direct flowage, on others indirectly and by backing up from overfilled natural water courses. They asked the court that defendants be permanently enjoined and prohibited from collecting, diverting and discharging said waters onto the lands of others in increased volume in such a manner that it is caused to be discharged upon the lands of plaintiffs at a place where it would not naturally have flowed.

Defendants' answer, among other things, admits that in 1948, they recleaned a ditch on their land which had been there for as long as 40 years but that the water flowing through said ditch flows in its natural course and is by the ditch discharged into a slough which is the natural drain and water course, the ditch and the water course that it empties into, both being upon the lands of defendants, and that the water through the ditch and the slough naturally drains in that direction.

It is then asserted that for more than 40 years, last past, this ditch has been in existence on the land of these defendants substantially similar to its present condition, and the surface water accumulating on defendants' lands had during that time drained through said ditch into the slough; that for all these years, this ditch has been maintained openly and notoriously, in the community where plaintiffs live and its use has been adverse, continuous and uninterrupted, and therefore plaintiffs are barred by the Statute of Limitations from now interfering therewith.

They further assert that the land of defendants is agricultural in nature, without drainage is swampy and wet, and that the ditch was originally constructed and later maintained for the purpose of draining and protecting these lands for agricultural purposes, and that the ditch leads "to a hollow depression, natural drain, natural water course, or other outlet located upon defendants' lands" and that by the provisions of Sec. 12,455 Mo. R. S. A. these defendants have the absolute right to construct and maintain said ditch,

The transcript is large and the witnesses numerous. Much of the testimony was undisputed. We will state the facts as we find them from the entire record.

Defendants owned a farm in Stoddard County of about 73 acres. There is a difference in the description of this land in the transcript, as agreed to by the parties, and the description as set out in the decree of the court. But as we view it, this irregularity does not affect the determination of this case. The plaintiffs own various farms, west and southwest of defendants' land, in Stoddard and Bollinger Counties. The nearest of plaintiffs' land was three-fourths of a mile from defendants and the most distantly located was approximately three miles. Running from northeast to southwest across the northern part of defendants' land was a public road and also parallel to the road, but north and west of it was a natural water course known as Cypress

Slough. On the southwest side of Cypress Slough was what was called a sand ridge, less than three feet in height. Whether the road is located on this ridge does not definitely appear, but the road, the ridge and the slough all ran across the northwestern part of defendants' land, from northeast to southwest. The natural drainage of Cypress Slough was to the southwest and toward plaintiffs' land. Part of it, at least, eventually emptied into drainage ditches 112 and 113. The water from these ditches flowed farther west into Castor River.

On defendants' land southeast of the slough, sand ridge and public road was a low place where surface water would accumulate. Some 40 years ago a V-shaped ditch had been constructed from this low place on defendants' land in a generally northwesterly direction through the sand ridge through a culvert under the road to Cypress Slough and the surface water from the low place on defendants' land in a generally northwesterly direction through the sand ridge through a culvert under the road to Cypress Slough and the surface water from the low place on defendants' land followed this ditch and emptied into that natural water course. The water then found its way naturally in a southwesterly direction through drainage ditches etc., into Castor River, as heretofore stated.

This ditch at the time of its construction was about 4½ feet deep where it crossed the sand ridge. Through the years this ditch would occasionally become partially filled with vegetation, sliding sand, etc. At various times prior to 1948, it had been cleaned out sometimes with the use of a horse and scraper, at other times by a tractor and grader, but at practically all times, it had been sufficiently deep to drain the water from defendants' land into Cypress Slough with the exception of from three to five acres. In 1948, defendants employed a man with a tractor and drag line to clean out this ditch again. The old ditch was followed except to partially straighten it at a corner further back on defendants' land, which was immaterial, as we view it, for a decision of this case.

There is a dispute as to the acreage of the watershed drained by this ditch. Some placed it at 500 or 600 acres, and others at 160 to 200. Not all of it was on the lands of defendants and as far as the record shows, there had never been any change in the watershed except the acreage might have been somewhat reduced when Highway 25 was constructed, which ran north and south and some distance east of defendants' land. There is some testimony that there was a natural drainage from defendants' low land toward the south and there was also some testimony that the natural drainage was toward the north and west, but the evidence greatly preponderates against any natural drainage toward the south and if there was any natural drainage to the low land prior to the construction of the ditch referred to, it appears to have been toward the north and west.

A man by the name of Strobbel owned a farm joining the defendants on the south and the evidence shows that between his land and that of defendants, there was another sand ridge which caused most of Strobbel's land to naturally drain toward the south and west but a few acres drained toward the land of defendants, and thence into Cypress Slough. The evidence further showed that in January, 1949, the lands of the plaintiffs were partially inundated by high water coming down the natural water course, which would be from the direction of Cypress Slough, into which the ditch in controversy emptied. The entire ditch, the sand ridge where it crossed and that part of Cypress Slough into which it emptied, were all on the lands of defendants. There was also evidence that water would overflow from another ditch known as No. 17, running in an easterly and westerly direction south of the lands of defendants and plaintiffs, as well as from drainage ditches 112 and 113, which ran through some of the lands of plaintiffs, and also back water from Castor River.

The evidence as to the state of the high water is comparative, that is, part relates to a high water period in June, 1945, before the ditch was opened up with the drag line and the high water of January, 1949, after the drag-line cleaning and it was claimed that the latter flood was greatly augmented by the fact that the ditch on defendants' land had been newly cleaned out, widened and perhaps deepened. The evidence showed that more land was inundated in January, 1949, than in June, 1945.

By agreement, twelve photographs were introduced in evidence. The record shows that these photographs were taken by Edward D. Kirby, a photographer in Bloomfield, Sunday, June 12, 1949, at 1 o'clock in the afternoon. The transcript does not show what these photographs are supposed to depict, and whether they are of the ditch or of Cypress Slough, we are unable to say. Two of them are of a culvert, apparently from opposite sides, and the rest merely show what appears to be wooded swamp land.

The court's decree, as modified, ordered defendants to restore the ditch at the sand ridge and at its western terminus to a depth not greater than 4.6 feet below the highest point of elevation of said sand ridge and that in the future, the ditch should not exceed the width of four feet at the bottom and 16 feet at the top thereof. From this decree, the defendants have appealed.

Defendants (appellants) assert that they have an absolute statutory right under Section 12,455 Mo. R. S. A., and earlier statutes, to construct the ditch in question, because it is wholly upon defendants' land and connected with a "hollow, depression, natural water course, or other outlet, also located on defendants' land, into which the water from the low area could be drained."

Section 12,455, now 244.010 Mo. R. S. 1949, is as follows:

*"The owner or owners of all or any part of any tract or parcel of swamp, wet, flat or overflowed land in this state,* situated within or without any drainage or levee district organized under any laws of this state, *shall have the right, under the provisions of this article, to drain or protect such land for sanitary or agricultural purposes,* without forming such land into a district, *by constructing an open ditch, laying tile or building a levee, and such ditch, tile or levee may be constructed through or across any tract or parcel of land situate between such land to be drained or protected and any lake, bayou, hollow, creek, artificial drainage ditch, river, depression or other outlet into which the waters from such swamp, wet, flat or overflowed land can be drained,* provided the owner or owners of the land through or upon which such ditch, title or levee must be built be paid a sum equal to the value of land, *if any,* consumed in constructing such works and the amount of damages, *if any,* that will be sustained by such land from the construction and maintenance of the improvement." (Italics ours.)

In deciding this contention, it would be well for us to review the history of this section. The first legislation on the subject was passed in 1885 (Laws of Mo. 1885, p. 156), the title of which was "An Act To Permit Owners of Land To Construct Drains For Agricultural Purposes." The first section of this Act states:

"That the owner or owners of land in this state shall be permitted to construct drains, for agricultural purposes only, into any natural water-course or any natural depression, whereby the water will be carried into any natural water-course, for the purpose of securing proper drainage to such land, without being liable in damages therefor to any other person or persons or comporations."

This statute granted an absolute and substantive right to construct drains to carry away surface waters. Gray v. Schriber 58 Mo. App. 173, Grandstaff et al. v. Bland, 166 Mo. App. 41, 148 S. W. 139.

The remainder of the act provides a way whereby the land owner may drain his land by constructing the ditch or part of it across the land of another to reach "any natural water course." The section next above quoted remained the law until 1909 when it was amended by inserting after the words "water-course" the following:

"or any drainage district ditch wherein the lands to be drained lie wholly within the drainage district established under the drainage laws of this state." (Laws of Mo. 1909, p. 466.)

In the revision of the Missouri Statutes for 1909, there was added another article entitled "Drainage of lands by individuals for agricultural or sanitary purposes." This is article 7 of Chapter 41, Sections 5676 to 5686 inclusive. These sections were derived from various sources and included in one article as above titled.

444

In 1913, the legislature repealed and re-enacted articles 6 and 7 of Chapter 41 Revised Statutes of 1909 and enacted new sections in lieu thereof (quoting from the title) "* * said new sections permitting the draining, tiling, and levying of land for agricultural or sanitary purposes, without forming such land into a district, with an emergency clause." Section 2 of this new act is now Section 12,455.

Considering this statute, and its history, it is clearly apparent to us, that, first, any owner of swamp, wet, flat or overflowed land may construct a ditch on his own premises to drain said land into "any lake, bayou, hollow, creek, artificial drainage ditch, river, depression, or other outlet" into which it can be drained when both are upon his land and, second, if the land of another is located between the area to be drained and the lake, bayous, etc., into which it is to be drained, method is provided to procure that land for that purpose. To construe this section, in the light of its history, as giving the owner of the wet land the right to drain it only when he must cross the land of someone else would lead to absurd results.

In Section 12,455, (244.010 Mo. R. S. 1949.) above quoted, we have italicized the portion of the statute which we think clearly gives the right to the land owner to drain his land when he owns, not only the land to be drained, but the intervening land and the place into which it is to be drained. The present section (12,455) confers the same rights regarding surface waters as the Act of 1885. To so drain their land of surface water for agricultural purposes is an act of good husbandry and a right we think defendants would have under the "common enemy" doctrine, regardless of the statute.

As said by Judge Ellison in City of Hardin et al. v. Norborne Land Drainage District of Carroll County et al., (Mo. Sup.) 232 S. W. (2) 921, (1. c. 926):

"And we have always followed the common law doctrine that surface water is a common enemy, and that each land proprietor may ward it off though by so doing he turns it on his neighbor."

This has always been the rule in Missouri. Benson v. C. & A. R. R. Co. 78 Mo. 504. White v. Wabash R. Co. (Mo. App.) 207 S. W. (2) 505.

Of course the rights given under the "common enemy" doctrine, must be exercised within reasonable limits and not recklessly, so as not to needlessly injure the servient tenements. Cox v. Hannibal & St. J. R. Co. 174 Mo. 588, 74 S. W. 854 l. c. 859. Hosher v. K. C. St. J. & C. B. R. R. Co. 60 Mo. 329. Abbott v. The Kansas City St. J. Council Bluffs R. R. Co. 83 Mo. 271. Keener v. Sharp. 341 Mo. 1192, 111 S. W. (2) 118. Casanover v. Villanova Realty Co. (Mo. App.) 209 S. W. (2) 556. Polich v. Hermann (Mo. App.) 219 S. W. 849. Place v. Union Twp. (Mo. App.) 66 S. W. (2) 584. Atchison, Topeka & Sante Fe R. R. Co. v. Taylor 87 Fed. Supp. 313.

Have defendants acted prudently and reasonably? We think they have. Their predecessors, before 1907, had dug a ditch on the site of the one in controversy for the purpose of draining their wet lands. This ditch was first constructed while the act of 1885 was in effect. This ditch had been cleaned, maintained and to some extent enlarged, intermittently, from that time until 1948, when it was again improved by the use of the drag line. The owner and operator of the drag line in question testified that while he did widen the ditch and make it U-shape instead of V-Shape, that in his judgment and from observation of the condition of the soil, that he took from the bottom of the ditch, that he went no deeper than the bottom of the original ditch. In other words, that while he widened it, he did not deepen it more than it had been originally.

The testimony of plaintiff Townsend showed that the V-shape ditch as constructed 40 years before and subsequently maintained was sufficient to drain all of defendants' low land except from three to five acres. The widening and deepening the ditch (if it were deepened) so as to drain this small area, we think was within reasonable limits, and a right that defendants had under the "common enemy" doctrine, and that they had an absolute right under the statute.

We have read with interest the many cases cited by the parties, where general principles are stated, and we have made an independent investigation of the cases in other states, but no case has been discovered where the facts are the same as in the case before us or where the statutory law is the same.

There is no need to consider the question raised regarding the statutes of Limitation and the prescriptive rights claimed by defendants.

It being our conclusion that the defendants were acting within their rights, the judgment of the trial court should be reversed. It is so ordered. *Blair, J.*, and *McDowell, J.*, concur.