See also, Mo.App., 515 S.W.2d 597.

**DUDLEY SPECIAL ROAD DISTRICT OF STODDARD COUNTY et al., Plaintiffs-Respondents,**

**v.**

**Glin HARRISON, Sr., and Bessie Harrison, his wife, Defendants-Appellants.**

**No. 9886.**

Missouri Court of Appeals, Springfield District.

Dec. 6, 1974.

Motion for Rehearing or to Transfer to the Supreme Court Denied Dec. 26, 1974.

Powell, Ringer & Baker, Dexter, for defendants-appellants.

C. H. Parsons, Jr., Claude Arnold, Dexter, for plaintiffs-respondents.

FLANIGAN, Judge.

In Count I of their petition respondents, plaintiffs below, sought an injunction requiring the defendants to remove an obstruction, in the form of a levee, placed across a natural watercourse known as Lick Creek and prohibiting defendants from again obstructing Lick Creek. The defendants filed a counterclaim, Count I of which requested injunctive relief. Both the petition and the counterclaim contained additional counts, but those counts, which requested damages, remain pending in the trial court for separate trial and they are not involved here.

Only the issues generated by Count I of the petition and Count I of the counterclaim were tried. The trial court found against the defendants on Count I of their counterclaim but defendants make no complaint with respect to that ruling. This appeal by defendants involves the propriety

of the action of the trial court in granting plaintiffs, on Count I of their petition, the injunctive relief hereinafter described. This court modifies the decree and affirms it as modified.

■ It is the function of this court, in this equity case, to determine the cause de novo, to weigh the competent evidence introduced upon the factual issues, to reach its own conclusions based on the evidence, and to defer to the findings of the trial court where conflicting testimony requires a determination of the credibility of witnesses. Martin v. Norton, 497 S.W.2d 164, 167[1] (Mo.1973); Rutherford v. Rutherford, 444 S.W.2d 439 (Mo.1969). "The judgment shall not be set aside unless clearly erronous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Rule 73.01(d), V.A.M.R.

In 1965, defendants, appellants here, constructed a levee on their land. The levee, which is approximately 1.3 miles long, runs east and west near the northern boundary of defendants' land. Most of the plaintiffs are owners of land lying north of the levee.

Running generally south, through the lands of the plaintiffs, is Lick Creek, a natural watercourse. Prior to the construction of the levee, Lick Creek flowed through the land of the defendants. It was the theory of the plaintiffs that the levee "blocked the natural flow of water" in Lick Creek and caused "said" water to collect north of the levee and to go upon and across the lands of the plaintiffs, causing them damage.

Plaintiff Dudley Special Road District of Stoddard County, Missouri, owns and maintains a road which runs north and south along the eastern boundaries of the lands of the plaintiffs. The levee caused water to back up upon that road and to interfere with its use.

Though it is an oversimplification, the factual situation may be better understood by visualizing the letter H. Plaintiffs' lands lie in the area within the H and above its cross-member. Defendants' lands lie within the H and below its cross-member. The cross-member itself is referred to in the evidence as "Old Highway 60," which runs east and west. The levee parallels Old Highway 60 and is a short distance south of it. Between the levee and Old Highway 60 is a ditch, or borrow pit, dug by the defendants on their land at the time the levee was constructed. Dirt from this ditch, which will be referred to as the levee ditch, was used in the construction of the levee.

The left side of the H, as the reader views it, is Drainage Ditch No. 12, hereinafter called "the main ditch." The right side of the H is another drainage ditch designated Lick Creek Lateral, hereinafter called "the lateral ditch."

A portion of the levee crosses the channel of Lick Creek and thus prevents water from flowing through that channel onto the defendants' land. A witness for defendants testified the length of Lick Creek, on defendants' land, was 7,200 feet.

At each end of the levee ditch the defendants inserted a metal pipe or "horn." Each of the two pipes was 48 inches in diameter and their combined cross-sectional or discharge area was 25.13 square feet. At the place where Lick Creek left the lands of the plaintiffs and entered the lands of the defendants, the channel of Lick Creek had a discharge area of 461 square feet. The purpose of the gate attached to the horn at the end of the levee ditch connecting with the main ditch was to prevent water entering the levee ditch from the main ditch when water in the main ditch was higher than the water level in the levee ditch. The gate of the horn at the other end had the same purpose with respect to the water in the lateral ditch. When the water level in the main ditch or the lateral ditch was lower than the water level in the levee ditch, the gates would open, or partially open, and permit water

to flow from the levee ditch into the main ditch and the lateral ditch.

Lick Creek existed before the main ditch and the lateral ditch were dug. Lick Creek originally crossed Old Highway 60 at the north line of the defendants' land near the center of defendants' land, and then meandered southeastwardly to a point near the southeast corner of defendants' land, where it intersected the lateral ditch. The lateral ditch continues south from that point until it joins the main ditch 1¼ miles south of defendants' land and the main ditch then continues southwesterly until it flows into the St. Francis River. There are five large openings or bridges in Old Highway 60 between the main ditch and the lateral ditch. The largest opening, 212 feet long, is located where Lick Creek crosses from the plaintiffs' land to the defendants' land. The ground level slopes from the two drainage ditches (the main ditch and lateral ditch) toward Lick Creek, the banks of Lick Creek being about three feet below the banks of the drainage ditches.

Each side presented testimony from many witnesses, lay and expert. The testimony was in sharp conflict. A reading of the transcript leaves no doubt that the construction of the levee created extreme bitterness among the litigants. Defendants offered testimony concerning the making of threats against the leveee and against the defendants themselves.

The theme of the evidence of defendants was that the construction of the levee had the effect of changing the course of the flow of Lick Creek but did not reduce the drainage benefits which plaintiffs had derived from its former channel across defendants' land.

Sitting in this atmosphere charged with animosity, the trial court was in the best position to weigh the credibility of the witnesses.

The trial court made findings of fact which included, in addition to most of the evidence set forth above, the following:

(a) Lick Creek for more than a mile upstream from the defendants' levee, and thus on the land of the plaintiffs, "was and is a three-pronged natural watercourse with a definite channel averaging some 75 feet in width with an average depth of 6 feet and an average width, at the bottom of the channel, of 12 feet."

(b) This natural watercourse carries water a substantial portion of the year, flowing generally south through the lands of the plaintiffs, passing under Old Highway 60 through the 212 foot bridge opening. "With the levee standing squarely in the path of Lick Creek and extending 1⅓ miles from [the main ditch] to [the lateral ditch], such water, both surface water and the flow of the natural watercourse, Lick Creek, as is unable to flow through the two 48–inch metal pipes backs up with the channel of Lick Creek and under the other four openings under Old Highway 60 and onto lands of some of the plaintiffs. The square foot discharge area of Lick Creek alone at the south side of Lick Creek Bridge where it leaves plaintiffs' lands and enters defendants' lands is 461 square feet. This is more than 18 times the discharge area of the two 48-inch metal pipes provided by defendants in lieu of the natural flow of Lick Creek. ($461$ divided by $25.13 = 18.3446$)."

(c) In April 1970, following heavy rains, the levee broke in the area of Lick Creek Bridge and in four other places roughly corresponding to the other four bridges on Old Highway 60. When the levee broke, "the backed up water on plaintiffs' lands fell very rapidly." Defendants subsequently repaired the levee.

(d) In so constructing and maintaining the levee, the defendants "have recklessly and unnecessarily collected both surface water and the flow of Lick Creek and forced it back on the land of some of the plaintiffs using not the lands of the defendants for the reservoir but the lands of some of the plaintiffs, and further have unnecessarily impeded and slowed down the

flow of water in the natural watercourse Lick Creek by trying to run a maximum of 461 foot discharge of water through two openings totaling 25.13 square feet which open only when the water level in both [the main ditch] and [the lateral ditch] is lower than that of the [levee ditch], thus causing both surface water and the flow of [Lick Creek] to back up and stand at a higher level and for a longer period of time over the lands of the plaintiffs than it did prior to the construction of the levee."

(e) The carrying capacity of the levee ditch is "far less than that which existed before defendants blocked and dammed up" Lick Creek.

As has been indicated, the testimony was conflicting. Numerous photographs were admitted into evidence reflecting conditions which existed before and after the construction of the levee. Engineering drawings were introduced and described.

In their brief defendants express their principal contention in the following language: "Even if Lick Creek is a natural stream (which [defendants] do not admit) they should not be compelled to remove that part of their levee which crosses Lick Creek, nor any part of their levee, since the ditch [defendants] dug has a larger holding capacity than that part of Lick Creek located on their land and has a larger carrying capacity and discharge capacity even with the two 48-inch horns in the ends of the ditch they dug than existed before they dug the ditch and built the levee."

■ The term "natural watercourse" has been defined as follows: "There must be a stream usually flowing in a particular direction, though it need not flow continually. It must flow in a definite channel, having a bed, sides or banks, and usually discharge itself into some other stream or body of water. It must be something more than a mere surface drainage over the entire face of a tract of land, occasioned by unusual freshets or other extraordinary causes. It does not include the water flowing in the hollows or ravines in land, which is the mere surface water from rain or melting snow, and is discharged through them from a higher to a lower level, but which at other times are destitute of water. Such hollows or ravines are not in legal contemplation water courses." Happy v. Kenton, 362 Mo. 1156, 1160, 247 S.W.2d 698, 701[2] (1952).

Witness Neal Mansfield, who had been familiar with Lick Creek since 1934, testified that its channel was 25 to 30 feet wide in places, that its water was very deep and swift, the depth reaching 10 feet in places. He had never seen Lick Creek dry and water flows in it nine months a year. He testified that Lick Creek was the original drainage for the area encompassing the lands of plaintiffs before any ditches had been constructed. Prior to the construction of the levee, Lick Creek flowed south through the land of the defendants and ultimately emptied into St. Francis River. The plaintiffs' lands are "trough-shaped" and "all of the drainage flows, depending on which side of the creek it is on, from the west or from the east into Lick Creek." Similar testimony was given by other witnesses. The defendants themselves, as plaintiffs in a prior lawsuit against a construction firm, had alleged in their petition that Lick Creek was a natural watercourse.

■ This court agrees with the finding of the trial court that Lick Creek is a natural watercourse. That finding is of paramount importance in analyzing the facts of this case and the law applicable thereto.

The top of the levee constructed by the defendants is approximately 8 or 9 feet above ground level. It is 15 to 20 feet wide at its bottom and the top of it is wide enough to accommodate a bulldozer. More than merely interfering with the original channel of Lick Creek, the levee completely blocked it.

■ Lick Creek being a natural watercourse, it was unlawful for the defendants

to have obstructed it so as to cause the waters of it to overflow, encroach upon and inflict damage to the land of plaintiffs. This is true without regard to the quality of the conduct which caused that obstruction, that is, whether intentional, negligent, nor non-negligent. Kelso v. C. B. K. Agronomics, 510 S.W.2d 709, 719[6] (Mo.App. 1974).

■ "Liability for damages for causing the overflow of the waters of a natural watercourse by reason of an obstruction is not based upon intention to obstruct the water (except in the rare case of a malicious intent to injure the property of another). Nor is the mere impounding of water the foundation of the action. The basis of liability is the fact that the obstruction causes the water to overflow, encroach upon and inflict special damage to the property of another. It is the impounding of the waters to such an extent that an overflow occurs and a trespass results—a wrongful act—which fixes liability. Whether the impounding of the waters is intentional or accidental, whether the overflow is caused by negligence or without negligence, the agency obstructing the flow and causing the overflow of the waters of a natural watercourse to the damage of adjacent property owners is liable for its misfeasance in an action of trespass." Corrington v. Kalicak, 319 S.W.2d 888, 894[8] (Mo.App.1959). To the same effect is Webb v. Carter, 121 Mo.App. 147, 153, 98 S.W. 776, 778[3] (1906).

■ When the trial court had properly determined that Lick Creek was a natural watercourse providing a continuing function in carrying off water from the lands of the plaintiffs, it could properly issue a mandatory injunction requiring a removal of the obstruction which was placed there by defendants and which was impairing that function. Hirsch v. Steffen, 488 S.W.2d 240, 243[3] (Mo.App.1972); Happy v. Kenton, supra, 362 Mo. at 1159–1160, 247 S.W.2d at 700[1]; Croley v. DeWitt, 431 S.W.2d 657, 659[4] (Mo.App.1968); Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118 (1937).

Defendants contend that the levee and the levee ditch merely rechanneled Lick Creek and did not obstruct it. This contention, which is lacking in merit, requires a review of some of the evidence.

All of the plaintiffs testified that since the levee was constructed water got deeper and stayed longer on their lands.

The levee constructed by the defendants extends from the east side of the main ditch to the west side of the lateral ditch. Plaintiffs' witness Sam Smith, an engineer, testified that Lick Creek, at the place where it entered the lands of defendants prior to the construction of the levee, had a cross-sectional area of 461 square feet. The combined cross-sectional area of the two 48-inch horns, one of which the defendant inserted at each end of the levee ditch, is 25.13 square feet.[1]

On cross-examination of plaintiff Neal Mansfield by counsel for the defendants, testimony was elicited to the effect that no water would have been backed up upon the lands of the plaintiffs if, though the levee had been built, the channel of Lick Creek had been left open under it. Without objection, plaintiff Glenn Heflin testified to the same effect.[2]

Glenn Heflin also testified that prior to the construction of the levee, Lick Creek did not overflow unless there was a rainfall of seven to nine inches and that after the levee was constructed a rainfall of two to three inches would cause Lick Creek to

1. It was the testimony of defendants' witness Trotter that if the horns at the east and the west ends of the levee ditch had been removed, and the levee ditch been permitted to discharge directly into the main ditch at its west end and the lateral ditch at its east end, the combined discharge area at those two ends would have been 425 square feet.

2. For discussion of the admissibility of testimony of this type, see Kennedy v. Union Electric Company of Missouri, 358 Mo. 504, 513, 216 S.W.2d 756, 760 (banc 1948).

overflow. Plaintiff John Bass testified that the water which gets on his land, since the construction of the levee, is water "that comes down through Lick Creek and backs up." Plaintiff Walter Avis testified that his land was frequently covered with water since the construction of the levee. In referring to the horns at the ends of the levee ditch, Avis testified "There wouldn't be any need for them at all if Lick Creek channel was opened up." Plaintiff John Jackson testified that after the levee was constructed water at his house, on one occasion, was two feet deep after a rain but that, prior to the construction of the levee, "bigger rains" did not produce water that deep . . . it never was up that high."

Plaintiffs' witness H. A. Meiderhoff, who was a registered professional engineer, a registered land surveyor, and a designer for the Missouri State Highway Department, testified that the two 48-inch horns, located at either end of the levee ditch, had a "flow capacity" of 250 cubic feet per second, while the channel of Lick Creek had a flow capacity of 560 cubic feet per second. The Highway Department had taken the latter figure into consideration in constructing a bridge under New Highway 60 which crosses the channel of Lick Creek near the northern boundary of defendants' land and had designed the bridge to accommodate a flow capacity of 720 cubic feet per second.

Mr. C. R. Trotter, a consulting engineer and a civil engineer, was a witness for the defendants. He testified that he made or supervised the making of measurements of the volume of the levee ditch and the volume of that part of the channel of Lick Creek which was situated on the lands of the defendants. It was his testimony that the volume of the levee ditch was approximately twice the size of the volume of Lick Creek on the defendants' land. He stated that the carrying capacity of a channel involves factors of velocity and volume. However, it was his testimony that

he did not have enough evidence to compare the carrying capacity of the levee ditch (assuming the horns were removed) with the carrying capacity of Lick Creek on defendants' land.

The trial court found that the carrying capacity of the levee ditch was in fact far less than that of Lick Creek before the channel of Lick Creek was blocked by the construction of the levee and the levee ditch.

■ The foregoing evidence justified the trial court in finding that water which, prior to the construction of the levee and levee ditch, would have flowed in the channel of Lick Creek was, by reason of that construction, caused to back up and enter the lands of the plaintiffs.

The defendants belabor the fact that in prior years they had installed three horns at the place near the *south* border of defendants' lands where Lick Creek formerly emptied into the lateral ditch. Two of these horns were installed in the 1950's and the third was installed in 1965. Defendants' evidence showed that these three horns had a combined discharge area of 17.28 square feet. The defendants also offered evidence to the effect that if the horns had not been installed at that point the discharge area of Lick Creek there would have been 85 square feet.

In essence, the argument of defendants is that even though the discharge area of the levee ditch, with the two horns installed, is only 25.13 square feet and thus less than the discharge area of Lick Creek at the place where it left the lands of the plaintiffs and entered the lands of the defendants (461 square feet), it was still greater than that afforded by the three horns at the *south* end of defendants' land (17.28 square feet). Moreover, defendants testified that they were willing to remove the two 48-inch horns from the levee ditch, thereby creating a discharge area of 425 square feet and thus exceeding the dis-

charge area of Lick Creek at its south end, whether the latter was horned (17.28 square feet) or not horned (85 square feet).

█ The record does not contain any convincing expert testimony to the effect that so long as the discharge area of the levee ditch (horned or not horned) exceeded the discharge area of Lick Creek at the south end of defendants' land (horned or not horned), that fact, standing alone, meant that the plaintiffs had not been damaged, i. e., that they were receiving the same drainage benefits from Lick Creek which they had received prior to the construction of the levee. The lay testimony offered by the plaintiffs, which the trial court believed, was overwhelmingly to the contrary and the scientific evidence supplied by plaintiffs' witness, H. A. Meiderhoff, seems consistent with that lay testimony. Certainly Mr. Meiderhoff's testimony was not inconsistent with it and defendants have not demonstrated that the trial court's finding was "clearly erroneous." [3]

Moreover, it seems clear that these installations at the south edge of defendants' property did not, prior to the construction of the levee, cause any damage to the plaintiffs. Indeed, as expressed in the defendants' statement of facts, "[S]ome of the plaintiffs testified that before the ditch and levee constructed by the defendants on the north side of their land were constructed, conditions were satisfactory even though the three horns were in such southeast corner of Mr. Harrison's [defendants'] property."

In Hirsch v. Steffen, supra, 488 S.W.2d at 244, a somewhat similar situation was presented. There the defendants, who had obstructed a natural watercourse, argued that in 1958, more than ten years prior to the institution of the action, the plaintiffs had participated with the defendants in certain construction which had the effect of obstructing an old river bed. But the court of appeals approved the finding of the trial court that any *significant* obstruction of the old river bed occurred in 1969 when the dam was constructed by the defendants and not in 1958. The court there said: "Obviously neither limitation nor estoppel under the circumstances here present could be premised upon such a recent event."

█ "Merely maintaining a dam on one's own land, without thereby raising the water above, will not create a prescriptive right to flow another's land; it is only the uninterrupted flowing of the lands for the statutory period that will create such right." Volume II Farnham, Waters and Water Rights § 559, p. 1799 (1904).

"[T]he mere fact that a dam has been in existence for the prescriptive time is not sufficient, if it did not cast the water back across the boundary line." Id. § 559(c), p. 1803.

█ "Since the acquisition of a prescriptive right depends upon the actual invasion of the rights of the upper owner, it will extend no further than such invasion is extended. The right is measured by the amount of water which has been kept standing upon the upper property, and not by the height of the dam, or the facilities which the lower owner had to cast the water across the boundary line." Id. § 560, p. 1804.

---

3. Without intending any criticism of defendants' expert witnesses who were assigned to investigate a matter of some complexity, their findings, if not inaccurate, were at least not consistent. The case was tried in two stages. At the first stage defendants' evidence showed that the portion of Lick Creek which was on defendants' land had a holding capacity of 516,750 feet and that it was 5,300 feet long. At the second stage of the trial, defendant's evidence showed a holding capacity of 673,485 cubic feet and a length of 7,200 feet. At the first stage defendants offered testimony that the storage capacity of the levee ditch was 4,650,750 cubic feet; at the second stage this computation was revised to 1,203,026 cubic feet.

So, here, the trial court could properly find that the plaintiffs had not been damaged by the installation of the three horns at the southeast portion of defendants' property between the time they were installed and the time the levee was constructed. The damage was directly and initially occasioned by the blocking of Lick Creek by the levee and levee ditch. Kennedy v. Union Electric Co. of Mo., 358 Mo. 504, 516, 216 S.W.2d 756, 761[5] (banc 1948).

Thus the contention of defendants that Lick Creek was not obstructed, merely rechanneled, is rejected.

Defendants contend that the levee merely served to protect their lands from surface water [4] originating on the land of the plaintiffs and that defendants had the right [5] to construct the levee "even though

4. Missouri cases dealing with what constitutes "surface water" include the following:

The term "surface water" refers to that form or class of water derived from falling rain or melting snow or which rises to the surface in springs and is diffused over the surface of the ground while it remains in that state or condition and has not entered a natural watercourse. Keyton v. Missouri-Kansas-Texas R. R., 224 S.W.2d 616, 622 (Mo.App.1949). Surface waters cease to be such when they reach a natural watercourse. Keener v. Sharp, 95 S.W.2d 648, 652 (Mo. App.1936); Jones v. Des Moines & Mississippi River Levee Dist. No. I, 369 S.W.2d 865, 875 [10] (Mo.App.1963); Hirsch v. Steffen, 488 S.W.2d 240, 245 (Mo.App.1972). However, when those waters overflow the banks of the natural watercourse, the escaping water again becomes surface water. Goll v. Chicago & A. Ry. Co., 271 Mo. 655, 197 S.W. 244 (1917); Jones v. Des Moines & Mississippi River Levee Dist. No. I, supra, 369 S.W.2d at 875. Water overflowing the banks of a stream must be regarded as surface water. Edwards v. Missouri K. & E. Ry. Co., 97 Mo.App. 103, 71 S.W. 366, 367 (1902); Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118, 120 (Mo.1937). "[A]n extensive watershed will finally result in such an accumulation of surface water as to create a water course, and just where surface water ends and water course begins may be difficult of exact determination." Tackett v. Linnenbrink, 112 S.W.2d 160, 164 [8] (Mo. App.1938).

5. Statements in Missouri cases dealing with rights and duties pertaining to surface water include:

"[O]ne may not obstruct a natural watercourse without liability for ensuing damages to others, but . . . one may otherwise treat surface waters as a common enemy and obstruct their flow without liability for ensuing damages so long as he does so reasonably and not recklessly or negligently." Happy v. Kenton, 362 Mo. 1156, 1160, 247 S.W.2d 698, 700 [1] (Mo.1952); "But one should not artificially impound or collect surface water and cast it in increased and destructive quantities upon the servient estate to its damage." Clark v. City of Springfield, 241 S.W.2d 100, 105 [5] (Mo.App. 1951); Wells v. State Highway Commission, 503 S.W.2d 689, 692 [2] (Mo.1973). "[I]t is not permissible for the dominant proprietor, in the exercise of his undoubted right to fight against surface water, to collect the same in a large body, conduct it by artificial means, as by a ditch, and discharge it upon the servient estate in an increased volume." Tucker v. Hagan, 300 S.W. 301, 303 (Mo.App.1927). "[T]he owner of a dominant estate cannot permit water to collect on his own premises and then discharge it in destructive quantities at one point in a body onto the servient estate." Blydenburgh v. Amelung, 309 S.W.2d 150, 152 (Mo. App.1958). "[O]ne proprietor cannot collect the surface water on his premises and turn it in a stream onto his neighbor's land. But it has never been held to be negligence or unskillfulness at common law for one proprietor to embank against surface water flowing onto his land from the adjoining land; but, on the contrary, his right to so protect himself has been uniformly vindicated by that law." Goll v. Chicago & A. Ry. Co., supra, 271 Mo. at 666, 197 S.W. at 247 [1] (1917). "[T]he owner of the servient estate may prevent by obstructions surface water from coming upon it, and in this manner throw water back upon the dominant estate without incurring any liability to the owner of the latter." Farrar v. Shuss, 221 Mo.App. 472, 282 S.W. 512 (1926). "[S]urface water is a common enemy which every man may ward off his land and thus throw it on an adjacent or lower owner, provided he does not, in warding it off, unnecessarily collect it and discharge it to the damage of his neighbor." Keener v. Sharp, supra, 341 Mo. at 1195, 111 S.W.2d at 120 [1]. The rule that forbids the dominant proprietor from collecting surface water in a body and precipitating it on the servient estate does not apply to cases where the diversion is merely incidental to the improvement of the premises in a proper manner.

this caused the water to be held back and thrown back onto the plaintiffs' lands to a greater extent than before the levee was constructed."

■ The evidence which has been outlined clearly justified the trial court in finding that *some* of the water of which plaintiffs complained was water which would have been part of the natural flow of Lick Creek channel if defendants had not obstructed that channel.

Defendants had no right to obstruct the natural flow of Lick Creek to the damage of plaintiffs. Since that obstruction caused a portion of the natural flow to escape the channel of Lick Creek, defendants may not deal with such escaping waters as if they were only surface water. Put otherwise, defendants may not improperly transform the natural flow into overflow and then claim that the latter is their common enemy, surface water. Edwards v. Missouri K. & E. Ry. Co., 97 Mo.App. 103, 109, 71 S.W. 366, 367 (1902); Standley v. Atchison T. & S. F. Ry. Co., 121 Mo.App. 537, 97 S.W. 244, 247 (1906); Keener v. Sharp, supra, 341 Mo. at 1195, 111 S.W.2d

at 120; Rice v. Stoddard, 312 S.W.2d 374, 378[2] (Mo.App.1958); Hirsch v. Steffen, supra, 488 S.W.2d at 243.

Defendants take the position that they "had the legal right" under § 244.010, RSMo 1969, V.A.M.S., quoted marginally [6], to construct both the levee ditch and the levee "to protect their lands from the water flowing from the plaintiffs' lands and to drain such water into the" main ditch and lateral ditch.

The legislative history of this statute is reviewed in Young v. Moore, 241 Mo.App. 436, 236 S.W.2d 740 (1951). The court held that the statute granted an absolute and substantive right to construct drains to carry away surface water. "To so drain their land of surface water for agricultural purposes is an act of good husbandry and a right we think defendants would have under the 'common enemy' doctrine, regardless of the statute." Young, supra, 236 S. W.2d at 744. However, the court said that the rights given under the common enemy doctrine "must be exercised within reasonable limits and not recklessly, so as not to needlessly injure the servient tenements."

Thompson v. Chicago M. & St. P. R. Co., 137 Mo.App. 62, 69, 119 S.W. 509, 512 (1909); Belveal v. H. B. C. Development Co., 279 S.W.2d 545, 553 (Mo.App.1955). "A distinction does and should exist between the discharge of surface water into a natural drainway on the landowner's property where it would have gone anyway, and the discharge of surface water on neighboring land where it would not naturally have drained." Haferkamp v. City of Rock Hill, 316 S.W.2d 620, 627 (Mo.1958). "[G]enerally, the authorities require that one must act within reasonable limits and not recklessly, in the development of his land, before they give him the benefit of the 'common enemy doctrine' which has become a part of our rule on surface waters." Wells v. State Highway Commission, supra, 503 S.W.2d at 692 [2]. See also Eilers v. Kodner Development Corporation, 513 S.W.2d 663, 666 (Mo. App.1974).

6. 244.010. "Drainage for agricultural or sanitary purposes

The owner or owners of all or any part of any tract or parcel of swamp, wet, flat

or overflowed land in this state, situated within or without any drainage or levee district organized under any laws of this state, shall have the right, under the provisions of this chapter, to drain or protect such land for sanitary or agricultural purposes, without forming such land into a district, by constructing an open ditch, laying tile or building a levee, and such ditch, tile or levee may be constructed through or across any tract or parcel of land situate between such land to be drained or protected and any lake, bayou, hollow, creek, artificial drainage ditch, river, depression or other outlet into which the waters from such swamp, wet, flat or overflowed land can be drained, provided the owner or owners of the land through or upon which such ditch, tile or levee must be built be paid a sum equal to the value of land, if any, consumed in constructing such works and the amount of damages, if any, that will be sustained by such land from the construction and maintenance of the improvement."

Young, supra, 236 S.W.2d at 744. The court then proceeded to study the question of whether or not the defendants in the Young case had acted reasonably and prudently, an inquiry which would have been unnecessary if defendants' contention with respect to the construction of the statute were a valid one.

Later, in Minton v. Steakley, 466 S.W.2d 441 (Mo.App.1971), the plaintiffs, represented by the same counsel who represents the defendants in the case at bar, argued that § 244.010, RSMo 1969, V.A.M.S., gave them "an absolute and substantive right to drain their land" into a certain lateral ditch. But the court stated: "Plaintiffs' rights are not absolute and without limitation." Minton v. Steakley, supra, 466 S.W.2d at 444. On the same page the court said: "The statute, § 244.010, does not confer rights any broader than those conferred by the general law. Young v. Moore, 241 Mo.App. 436, 236 S.W.2d 740, 744[3][5]."

■ Although defendants did have certain rights under § 244.010, defendants could not, in the exercise of those rights, obstruct a natural watercourse, Lick Creek, to the damage of plaintiffs. Indeed, the plaintiffs themselves, under the statute, had the right to drain their land, for sanitary or agricultural purposes, by constructing a ditch from their lands to Lick Creek. Such a right could be thwarted if defendants' construction of the statute were adopted and defendants were held to be entitled, with impunity, to obstruct that natural watercourse. The rights which defendants admittedly have under the statute could be exercised without obstructing Lick Creek, and the enjoinder of the latter conduct does not infringe upon those rights.

■ This court finds that although the plaintiffs were entitled to injunctive relief, the order which the trial court entered is too broad. "[A] court of equity will grant injunctive relief only where rights are clearly established." Adamick v. Fergu-

son-Florissant School District, 483 S.W.2d 629, 633[9] (Mo.App.1972); Minton v. Steakley, 466 S.W.2d 441, 443 (Mo.App. 1971). "It is the purpose of an injunction to restrain actual or threatened acts which constitute a real injury and is to be used sparingly in clear cases only, and the decree should be so framed as to afford the relief to which complainant is entitled, and not to interfere with legitimate and proper action on part of those against whom it is directed." Henson v. Payne, 302 S.W.2d 44, 50[9] (Mo.App.1956).

The trial court granted the plaintiffs injunctive relief and entered its order restraining the defendants from maintaining the levee and ordering the defendants "to restore conditions where Lick Creek leaves the lands of plaintiffs and enters defendants' lands so that the flow of the natural watercourse will be as it was before the construction of the levee; *and so that the surface water shall not be unnecessarily collected and forced back onto the lands of plaintiffs*; or in lieu of the foregoing, defendants shall provide drainage both in volume and in carrying capacity equivalent to that which existed in the natural stream, Lick Creek, before the construction of the levee *and in addition shall not unnecessarily collect and impound surface water and force it back onto lands of plaintiffs.*"

■ Count I of the petition, in referring to the water complained of, termed it "the water from the known watercourse of Lick Creek." There is no allegation in that count with respect to "surface water" coming upon the lands of plaintiffs by reason of the wrongful acts of the defendants. *It does not contain any allegations with respect to unnecessary collection, impoundment or forcing back of surface water upon the lands of the plaintiffs.* There was no evidence attempting to identify the unwelcome water as surface water. Thus the italicized portion of the decree, being supported neither by the pleadings nor by the evidence, should be, and is by this court, deleted. In other respects, the ac-

tion of the trial court was not clearly erroneous.

The cause is affirmed and remanded with directions that the decree be modified in accordance herewith.

All concur except BILLINGS, J., who took no part in consideration or decision of this case.