# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00398-CR

**Nicholas George Ramus, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 2 OF HAYS COUNTY NO. 90604, HONORABLE LINDA RODRIGUEZ, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following a bench trial, Nicholas George Ramus, Jr. was convicted of misdemeanor deadly conduct. *See* Tex. Penal Code Ann. § 22.05 (West 2003). The court assessed Ramus's punishment at one year of confinement in the county jail and a $700 fine, suspended imposition of the jail sentence, and placed Ramus on probation for two years. On appeal, Ramus argues that (1) insufficient evidence supported his conviction and (2) the trial court erred in denying his motion for a new trial based on the prosecution's failure to disclose exculpatory evidence to the defense. We affirm the judgment of the trial court.

## BACKGROUND

Ramus and the complaining witness, Carolyn Logan, had owned neighboring properties on Old South Bastrop Road in Hays County for about two decades before the incident

giving rise to this case.[1]  Their relationship had deteriorated over the years as Logan repeatedly voiced complaints about the use and condition of Ramus's property.  Logan initially complained that sewage was flowing onto her property from Ramus's property. Later, when Ramus was installing a new septic system, Logan complained that the system was not being installed in compliance with the local environmental code. She also claimed that Ramus's property was full of junk and was harboring rodents.  Logan complained not only to Ramus directly, but in some instances to the county environmental health department and the county commissioner.  Ramus claimed that he had to file a lawsuit against the county when Logan's "friends on the county government had illegally pulled my septic permit."  Further, Ramus said that he had been trying to open a restaurant on his property but that Logan "used every legal channel to try to stop me." It is with this background that we turn to the events of September 5, 2008.

According to Logan, a contractor was operating a backhoe on her property that day, leveling some dirt along the fence line she shared with Ramus.  Logan, who was mowing her grass in the same field, saw Ramus approach the backhoe driver while carrying a shotgun.[2]  Logan testified that she was about one hundred yards away and could not hear the men's conversation or fully see Ramus where he stood opposite the backhoe. Soon, however, she saw the backhoe pull away so quickly that she thought it would tip over as it left her property.  She claimed that Ramus then waved to her, pointed to the ground before him as if to summon her there, and leveled his shotgun at her.

_____

[1]  The facts recited herein are taken from the testimony and exhibits admitted at trial and at the hearing on Ramus's motion for new trial.

[2]  At trial, Logan testified that she thought the weapon was a rifle. The gun that Ramus admitted to carrying on the day in question and that sheriff's deputies recovered from his home was a shotgun, but as Logan explained to defense counsel, "To me a long gun is a rifle."

2

She also described hearing a deep voice at that moment, not coming from Ramus or any other person nearby, telling her that Ramus was going to shoot her.  Terrified, she ran inside her home to call for help.

While waiting for law enforcement, Logan received a call from one of her neighbors, Reed Carr, who lives across the street from Logan and Ramus. Carr testified at trial that he had been working out in his yard when he saw the backhoe turn out of Logan's gate so quickly, it raised up on two wheels as if to topple over. He immediately called Logan to ask, "What in the world is going on over there?" According to Carr, Logan answered, "Well, Ramus has a gun and threatened to kill us I guess." Carr testified that she sounded "rather excited and scared" and "wasn't her normal self."

Ramus, however, denied doing anything to cause such panic.  He testified at trial that on the day in question, he was cleaning his guns on his front porch when he saw the smoke from the backhoe and became concerned that a previous project on Logan's land, which he felt had caused damage to his own, was continuing.  Ramus stated that he had five slipped discs in his back, which caused him to feel anxious about self-defense in a possible altercation:

> I can't defend myself when I can't run . . . if he was angry and was in a bad state of mind he could have run me over with the bulldozer and I couldn't have run out of the way.  He could have had a gun, too.  Who knows.  I mean when someone is damaging your property, you don't know what the scenario is.[3]

---

[3] Logan, who had been neighbors with Ramus for twenty years, testified that she was unaware that he had any physical impairments or needed assistance to walk.  In fact, on the day of the incident, she described him as "stomping" and appearing agitated based on the way he walked.

Accordingly, Ramus testified, he carried his shotgun with him to go investigate.[4]

Nevertheless, according to Ramus, his exchange with the backhoe driver remained "respectful" and "cordial," and the driver assured him that he was not involved with the earlier property damage. Ramus denied that the driver sped off, testifying instead that the driver walked calmly away from the backhoe and left with his supervisor in a pickup truck. Ramus testified that he then heard Logan calling to him, but could not make out what she was saying, so he merely waved to let her know things were all right and returned to his house. Ramus denied pointing his gun at her at any time.[5] Sore from carrying the shotgun—which Ramus testified that he had not handled in years due to his injuries and could not in fact shoulder without great pain—he was preparing to take a hot shower when two sheriff's deputies arrived at his door.

Both deputies testified that after interviewing Logan, who they characterized as "upset" and "frantic," they proceeded to Ramus's home, detained him for questioning, and recovered his shotgun from within the house. They ultimately placed him under arrest for deadly conduct. After waiving his right to a jury trial, Ramus was tried before the court.

After the trial, the court found Ramus guilty. The defense subsequently learned that the State had received certain information—chiefly that Logan thought she had heard a disembodied voice during the incident—in an interview with her sometime before trial. Ramus filed a motion for

---

[4] The shotgun was loaded by the time it was taken in evidence. Ramus admitted at trial that he had loaded it before approaching the backhoe operator.

[5] Ramus also testified that he never even felt animosity toward Logan, despite all their differences. As he put it, "I kind of feel sorry for her. I don't think she's in—in control of her own behavior." While admitting to feeling frustrated, he asserted, "I've never attacked her in any way, shape, or form. I've not even got angry at her."

4

a new trial, claiming that the information was exculpatory and should have been disclosed prior to trial pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). After conducting an evidentiary hearing on June 1, 2010, the court denied the motion for a new trial. Ramus now appeals, alleging two points of error: that (1) there was insufficient evidence to support his conviction and (2) the trial court erred in denying his motion based on the exculpatory evidence not being timely disclosed.

## STANDARD OF REVIEW

Ramus challenges the legal sufficiency of the evidence supporting his conviction of deadly conduct.[6] In reviewing the legal sufficiency of evidence, we examine evidence to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010); *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). We must review all evidence in the light most favorable to the verdict and assume the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner supporting the verdict. *Jackson*, 443 U.S. at 318–19. In a bench trial, the trial court is the sole judge of the credibility of witnesses and may accept or reject any part of their testimony. *Johnson v. State*, 517 S.W.2d 170, 173 (Tex. Crim. App. 1978). As the trier of fact, it is "in the best position to judge the credibility of a witness because it is present to hear

_____

[6] While Ramus's argument is entitled "The Evidence is Legally and Factually Insufficient to Support the Conclusion," Ramus correctly cites to the most recent court of criminal appeals opinion on this standard, *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (holding that the *Jackson v. Virginia* legal-sufficiency standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt"). We will construe all of Ramus's arguments as challenges to the legal sufficiency of the evidence.

5

the testimony, as opposed to an appellate court who relies on the cold record." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

Ramus also appeals the denial of his motion for a new trial. Because whether to grant a motion for a new trial is within the sound discretion of the trial court, we review the trial court's judgment for abuse of discretion. *See State v. Herndon*, 215 S.W.3d 901, 907 (Tex. Crim. App. 2007). Abuse of discretion further serves as a prism through which we view the legal standards relevant to the trial court's basis for denying the motion, in this case the question of exculpatory evidence not disclosed to Ramus before trial. *See, e.g.*, *State v. Gill*, 967 S.W.2d 540, 542 (Tex. App.—Austin 1998, pet. ref'd).

The standard for whether the State violated its affirmative duty to disclose such evidence to a defendant, warranting reversal under *Brady v. Maryland,* is whether (1) the prosecution, regardless of good or bad faith, withheld evidence; (2) the evidence is favorable to the defendant; and (3) the evidence is material. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). The same analysis applies when, as alleged in the present case, the State did disclose the relevant evidence but not in a timely manner. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999).

## DISCUSSION

**Sufficiency of Evidence**

In his first point of error, Ramus challenges the sufficiency of the evidence to support his conviction. To find him guilty of deadly conduct, the trial court needed to determine beyond a reasonable doubt that Ramus recklessly engaged in conduct that placed another in imminent danger

6

of serious bodily injury, presuming recklessness and danger if he knowingly pointed a firearm at or in the direction of another whether or not he believed it to be loaded. Tex. Penal Code Ann. § 22.05(a), (c). We must reverse only if no rational trier of fact could have found these essential elements. *Brooks*, 323 S.W.3d at 895.

Logan testified at trial that Ramus approached the fence line of her property carrying a shotgun, and—after a short conversation with the backhoe driver, who abruptly left, practically tipping over the backhoe—Ramus gestured for her to come close and then leveled the shotgun at her. This testimony on its own is legally sufficient to support the conviction. Ramus asserts, however, that Logan's testimony must be wholly disregarded because Logan also admitted hearing a disembodied voice at the same time as the alleged offense. We disagree.

Ramus's argument regarding the sufficiency of the evidence is solely premised on Logan's testimony not being credible. As an appellate court, we afford almost complete deference to the fact finder's decision when that decision is based upon an evaluation of credibility. *See Lancon,* 253 S.W.3d at 705. As the State suggests, an alternate explanation for the voice is simply that this was a moment of extreme stress for an otherwise healthy person. This explanation is consistent with evidence presented to the trial court describing Logan's state of mind at or near the time of the alleged offense. Carr, the neighbor who spoke with Logan minutes after her encounter with Ramus, testified that Logan was "rather excited and scared." Sheriff deputies testified that when they arrived Logan was "very frantic," "upset," and "excited." Logan herself testified that during the incident she was scared and, immediately afterwards, was crying and "very upset." As

7

a result, the trial court could have reasonably inferred that Logan's testimony concerning a voice was a result of the stress of the moment.

Further, the trial court heard other evidence tending to support Logan's credibility. For example, there were discrepancies between Logan's and Ramus's accounts of the incident, beginning with how the backhoe operator reacted after his conversation with Ramus. Logan's version—that the backhoe left abruptly, almost tipping over—was corroborated by her neighbor, Carr. In addition, the trial court heard Carr's testimony of what Logan said mere minutes after the incident: "Well, Ramus has a gun and threatened to kill us I guess." As a matter of law, evidence of this sort is considered especially trustworthy given the surrounding circumstances. *See Lancon,* 253 S.W.3d at 706; *Rabbani v. State*, 847 S.W.2d 555, 560 (Tex. Crim. App. 1992) (explaining that present sense impression statements may be considered exceptionally reliable because they are safe from error of memory and there is little or no time for a calculated misstatement; therefore, they are excluded from the hearsay rule). It was not unreasonable for the trial court to rely upon the testimony of Logan given the circumstances surrounding the incident and the evidence supporting her version of the events.

Ramus, on the other hand, claimed that he had never been angry with Logan despite their history of disputes, although he felt the need to protect himself with a loaded shotgun when engaging in a conversation with the backhoe operator. All of this was presented to the trial court, which as fact finder is best positioned to decide upon the credibility of the testimony; it may choose to believe some testimony and disbelieve other testimony. *See Lancon*, 253 S.W.3d at 705–06. As an appellate court, we defer to the trial court's decision regarding what weight to give testimonial

evidence because the decision is most likely based on an evaluation of credibility and demeanor. *See id.* at 706.

Because a rational trier of fact could have found the essential elements of deadly conduct, we hold that the evidence supporting Ramus's conviction was sufficient. Ramus's first point of error is overruled.

**Disclosure of Exculpatory Evidence**

In his second point of error, Ramus asserts that the trial court erred in denying his motion for a new trial based on exculpatory evidence not timely disclosed. Specifically, Ramus contends that the State knew and failed to disclose prior to trial that Logan claimed to have heard a disembodied voice at the time of the alleged offense.

Pursuant to *Brady v. Maryland*, prosecutors owe an affirmative duty to disclose any evidence in their possession that is favorable and material to a defendant's case under the Due Process Clause of the Fourteenth Amendment. 373 U.S. at 87; *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) (impeachment evidence is "evidence favorable to an accused" under *Brady*). The defendant bears the burden of proving materiality, meaning a "reasonable probability" of a different outcome had the evidence in question been disclosed. A reasonable probability is shown when the withholding of evidence "undermines confidence in the outcome of the trial"; the question is whether the defendant received a fair trial, understood as resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

There is no dispute that prosecutors knew, but did not disclose prior to trial, that Logan claimed to have heard a disembodied voice at the time of the alleged offense. Thus, this case

9

turns on whether that evidence, which was disclosed at trial through Logan's direct testimony, was material. In cases concerning timely disclosure, evidence is material if there is a reasonable probability of a different outcome had it been disclosed sooner. *Wilson*, 7 S.W.3d at 146. Disclosure is timely if it occurs in time for the accused to put the evidence to effective use at trial. *See, e.g.*, *Marchbanks v. State*, 341 S.W.3d 559, 563 (Tex. App.— Fort Worth 2011, no pet. h.); *Palmer v. State*, 902 S.W.2d 561, 565 (Tex. App.—Houston [1st Dist.] 1995, no writ). On direct examination at trial, Logan admitted that at the time of the alleged offense she heard a voice. Counsel for Ramus then cross-examined Logan as follows:

| | |
|---|---|
| COUNSEL: | You said you heard a "deep voice, not your own." Can you elucidate and tell me about that a little bit? |
| LOGAN: | "He is going to shoot you." That's what I heard. |
| COUNSEL: | "And you say you heard—whose voice was that? |
| LOGAN: | Just a deep voice. Not my—not my own thought. |
| COUNSEL: | Was there another person there? |
| LOGAN: | Not—not another person. It was—it was what I heard. |
| COUNSEL: | I understand. But I'm trying to find—I just want to determine the origin of this—of what you heard. Was this a supernatural voice? |
| LOGAN: | It could have been. I don't know. |
| COUNSEL: | But there wasn't somebody there. |
| LOGAN: | There was no one there beside me. |

Thus, the record shows that Ramus had sufficient opportunity to effectively put to use at trial the evidence of Logan's perceived voice. Accordingly, the disclosure of the disembodied voice heard by Logan was timely.

However, Ramus argues that had he known about this evidence sooner he could have obtained other evidence, such as medical records or testimony concerning Logan's mental health. Ramus also argues that earlier disclosure would have allowed him to retain an expert on auditory hallucinations and their impact on reliability of witness testimony. In other words, Ramus alleges that earlier disclosure could have lead to *other* material evidence. Ramus contends that without this additional information, his use of Logan's admission at trial could not be effective. This reasoning is overly speculative.

Direct evidence of a serious mental illness by a complaining witness might indeed undermine confidence in the outcome of a trial. *See generally* Tex. R. Evid. 601(a)(1), 607. Nevertheless, such evidence is not actually at issue here. What the prosecution failed to disclose before trial was its knowledge of a statement that *might* have led Ramus to such evidence. From the record before us, this Court has no way to determine whether such evidence of mental illness even exists or how such evidence might be used by the defense. *See id.* R. 510 (communications and records concerning the mental health of a patient are generally privileged). Similarly, while earlier disclosure might have caused Ramus to obtain an expert on hallucinations, this Court has no way to determine whether such an expert exists, what opinion such an expert might give, and whether such an opinion would be admissible. *See id.* R. 702 (generally a qualified expert may give testimony that will assist the trier of fact); *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App.

11

1992) (outlining criteria that must be met in order for a court to determine that expert testimony is sufficiently reliable).

The mere possibility that an item might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. *Webb v. State*, 232 S.W.3d 109, 114 (Tex. Crim. App. 2007) (citing *Hampton*, 86 S.W.3d at 612). A reviewing court is required to analyze "how the defensive strategy might have differed or what would be the probable impact of discovering the [alleged Brady material]." *Hampton*, 86 S.W.3d at 612. On the record before us, this Court cannot perform this required analysis. In other words, only a reasonable probability of a different outcome would warrant reversal, and the probability of Ramus finding and presenting *other* material evidence is simply incalculable. *See Wilson*, 7 S.W.3d at 146 (overruling *Brady* claim based on tardy disclosure and noting that appellants failed to "point to anywhere in the record that explains what witnesses he might have called had his attorneys been given further time to investigate" and did not show "any reason to believe that additional witnesses exist").

We conclude that Ramus failed to meet his burden to prove the materiality of any evidence of which he was denied effective use at trial. We therefore hold that the trial court did not abuse its discretion in denying Ramus's motion for new trial. Ramus's second point of error is overruled.

**CONCLUSION**

Because we hold that sufficient evidence supported Ramus's conviction and the trial court did not err in denying his motion for a new trial, the trial court's judgment of conviction is affirmed.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed:   October 14, 2011

Do Not Publish

13