Max **SENKEVECH** and Adam Senkevech, Appellants,

v.

E. N. **VAUGHN** and Wanda M. Vaughn, Respondents.

No. WD 30805.

Missouri Court of Appeals, Western District.

Dec. 30, 1980.

Nicholas L. Swischer, Nevada, for appellants.

Kendall R. Vickers, Nevada (Ewing, Ewing, Carter, McBeth & Smith, Nevada, of counsel), for respondents.

Before PRITCHARD, P. J., and SWOFFORD and TURNAGE, JJ.

PRITCHARD, Presiding Judge.

This suit began by petition in five counts for a mandatory injunction to abate, cease and desist from further construction of a levee or dike across an alleged natural waterway or slough across defendants' land, said to have caused flooding upon plaintiffs' lands, to remove the dike or levee, and for certain damages alleged to have been sustained in connection therewith.

In the course of the proceedings, the petition was amended to plead the cause in 25 counts. The issues involve the propriety of the trial court's action in granting defendants' motion for summary judgment as to counts relating to claims for damages.

Max Senkevech owns land in the Big Drywood Creek bottom in the western part of Vernon County, Missouri. His father, Adam Senkevech, owns land lying to its east. Part of Adam's land on its northern portion is bounded by Big Drywood Creek, which stream, flowing northward, meanders through the southern part of his property. Moore's Branch runs through a portion of Max's property on its southern side and eventually flows into Big Drywood Creek. Defendants own considerable acreage to the north of this area, and between Max's land and defendants' land, one Eastburn owns land which is apparently mostly timbered.

In 1902 an old levee was built around the south and east sides of what is now defendants' land, but it had washed out in places allowing surface and flood waters to flow northward from the levee eventually into Big Drywood Creek. Defendants purchased their land in 1976, in which year there was a flood which inundated over 300 acres. They proceeded then to build dikes around the land's south, east and west boundaries to protect about 380 acres, using "flapper valves" (to let surface water out from the enclosed area after outside water had subsided). The dikes were placed, in part, on top of the old levee.

On Max's land is Kingfisher Slough which is somewhat "S" shaped and which lies in a generally north-south direction. The slough is 5, 6 to 10 feet deep in places, and in a wet time, part of the water therein would run north through ditches or breaks in the old levee, which was about 3 feet high, and part of the water would run south

into Moore's Branch. A survey in evidence shows a high place about the center of the slough. Water would run north from Moore's Branch, when it was full, thence north across defendants' land where it eventually flowed into Big Drywood Creek.

There was mention in the evidence of a West Slough which apparently originated on lands to the west and northwest and through or over which water flowed into the timber south of defendants' land; and that water and the water from Kingfisher Slough stopped against defendants' dike. The ground to the east, being higher, prevented the water from going into Big Drywood Creek. Before the dike was built water would have gone across defendant's property in ditches, straight north and would not have overflowed. The water thereafter backed up on plaintiffs' lands about a half a quarter, and remained thereon about 35 to 40 days before it subsided by reason of a flood washing out defendants' dike which allowed the water to escape. The foregoing is the substance of plaintiffs' testimony. Additionally, their witnesses testified: Kenton "Bud" Pettibon rode horseback in May, 1976, before the flood, from the west to about Kingfisher Slough, then to the levee or dike. He saw water standing there about 18 inches deep on the south side of the dike. Before the dike was built there was a ditch through it deep enough to drain in a northerly direction. Ralph Capps described Kingfisher Slough as going up into the timber as a defined stream for possibly 150 to 200 yards, and then it branched out and disappeared as a defined stream and became a bunch of small ditches from there north. There was a diffusion of about 4 or 5 ditches, the deepest being about 1 to 1½ feet. Willard L. Wolfe described the slough or ditch as getting shallow as it gets close to defendants' land, and it tends to spread out.

The foregoing evidence was taken in connection with the request for temporary injunction, which was granted, but the terms of which are not included. The parties then came to an agreement, on November 21, 1977, with respect to the issue of a mandatory injunction, and a consent judgment was entered by the court. That judgment, in general, provided that defendants would construct a ditch or drainage facility on the south and east sides of their dike leading east and north to Big Drywood Creek for the purpose of draining water which might collect on plaintiffs' land. No issue is presented as to the consent judgment. It disposed of all issues except those in plaintiffs' various counts as to past damages.

Then, on December 6, 1978, defendants filed their motion for summary judgment alleging "that there was no genuine issue as to any material fact and that said defendants are entitled to judgment as a matter of law on plaintiffs' claim for damages for the following reasons: 1. That the only remaining issue before the court are plaintiffs' alleged claims for crop damages occurring prior to November 21st, 1977. 2. That notwithstanding any evidence as to the amount of damages, plaintiffs' claim for damages can only present an issue to the court if there is sufficient evidence of liability. 3. That the Judge of this court has personally viewed the property which is the subject matter of this lawsuit and the area alleged to be a waterway obstructed by the defendants, and is capable, from his own personal observation of determining whether or not, as a matter of law, the area being obstructed as (sic) a waterway under Missouri law. 4. That plaintiffs have stated no other genuine cause of action. The undersigned files no affidavits in support of this Summary Judgment, choosing to rely instead, upon the personal observations by the Judge of this court."

In granting defendants' motion for summary judgment the court made this memorandum: "The record may not show the Court's observations made upon an inspection of the levee and the terrain in the fall of 1977. The Court concluded that the levee obstructed nothing which could be considered a natural water course with a definite channel, sides or banks. This inspection tour was made in the company of both attorneys and the plaintiffs. In addition to his personal observations, the Court is considering also the testimony on the

August 17, 1977, hearing, and all the pleadings and suggestions of the parties. In my opinion, the defendants were within their rights under the 'common enemy' doctrine to construct the levee to ward off the flood waters—even though plaintiffs were undoubtedly damaged in that the flood waters were caused to be held longer on plaintiffs' land and caused to cover a larger area of plaintiffs' land than would otherwise be the case."

■ The court's view of the area *alone* would not suffice to sustain the judgment for that view, standing alone, would not be evidence under *Koplar v. State Tax Commission*, 321 S.W.2d 686, 696[10] (Mo.1959). But that case does note the legitimate purpose of an inspection to illustrate the evidence and provide a base for understanding and comprehending testimony upon the record. As above noted, the court took into consideration the previously adduced testimony, the substance of which is set forth above. That testimony, coming from plaintiffs' side of the case, demonstrates conclusively that there was no *natural* watercourse going from their land onto respondents. "Natural watercourse" is defined in *Dudley Special Rd. Dist. of Stoddard Cty. v. Harrison*, 517 S.W.2d 170, 175[2] (Mo.App. 1974): " 'There must be a stream usually flowing in a particular direction, though it need not flow continually. It must flow in a definite channel, having a bed, sides or banks, and usually discharge itself into some other stream or body of water. It must be something more than a mere surface drainage over the entire face of a tract of land, occasioned by unusual freshets or other extraordinary causes. It does not include the water flowing in the hollows or ravines in land, which is the mere surface water from rain or melting snow, and is discharged through them from a higher to a lower level, but which at other times are destitute of water. Such hollows or ravines are not in legal contemplation water courses.' *Happy v. Kenton*, 362 Mo. 1156, 1160, 247 S.W.2d 698, 701[2] (1952)."

Both plaintiffs described the area through which water flowed in rainy or flood times on the south side of respondent's property and through it, before the dike was built, as a ditch. Adam Senkevech described the bed of the ditch where it runs north of Kingfisher's Slough: "A. The further it goes the smaller it gets because it's got such a fall there, don't need no ditch there but there is a ditch there, a small ditch." He believed it was two feet wide. Kingfisher Slough flows both north and south, depending on how much water is in Moore's Branch. Witness Pettibon testified that before the dike was built there was a ditch through it deep enough to drain in a northerly direction. Capps described Kingfisher Slough as being a defined stream for 150 to 200 yards, and then it branched out and disappeared as a defined stream and became a bunch of small ditches from there on north. There were 4 or 5 ditches, the deepest being about 1 to 1½ feet. Wolfe described the slough or ditch as getting shallow as it got close to appellants' land, tending to spread out.

■ It is clear from this testimony that there existed no natural watercourse, as defined in the *Harrison* case, supra, which existed before the dike was built. All that was there were small ditches serving to drain the area south of the dike of surface water from a slightly higher level. After the dike was built there was, of course, water from rains collecting south of the dike. [Apparently this has been solved by ditching to the east under the terms of the consent judgment mentioned above.] This situation is governed by the quite analogous case of *Camden Special Road Dist. of Ray County v. Taylor*, 495 S.W.2d 93 (Mo.App. 1973). There, the defendants raised a private road on their property and eliminated culverts, which prevented surface water from flowing onto their lower land, but "dead water" was backed up upon a public road about 16 inches deep. The court reversed the judgment and entered judgment for defendants. Cited and quoted in the *Taylor* case, page 98, is *Gibson v. Sharp*, 277 S.W.2d 672 (Mo.App.1955), " '[A] landowner may dam against surface water even though in doing so he casts it back upon his

neighbor' provided he does not 'gather it and discharge it at one place to the injury of an adjoining owner.' " There is no fact that defendants cast any water upon appellants' land, nor is there any fact showing that they acted in an unreasonable way in constructing the dike, considering what was permitted them in combatting the "common enemy" under the *Harrison* case, supra, plaintiffs' contention in this regard notwithstanding. Plaintiffs did not respond to the motion for summary judgment by way of demonstrating specific facts which would show a genuine issue. They say that the summary judgment was improper because defendants had filed no answer to the petition. No answer is required under Rule 74.04(b) which provides that the motion may be filed at any time.

§ 244.010, RSMo 1969, has no application to the facts of this case. That statute does not do away with a landowner's rights under the common enemy doctrine. *Harrison*, supra. It provides only that an owner of swamp, wet, flat or overflowed land may construct open ditches, tiles or levees to drain or protect it, and the owner must pay the value of land of another only over which the works are constructed.

Plaintiffs claim a right by adverse possession (right by prescriptive use) to continue to drain their lands through the ditches to and onto defendants' lands. The contention must be denied because there is no fact pleaded or in the evidence that plaintiffs or their predecessors in interest, or anyone else, ever did any affirmative act, as by constructing artificial channels to drain their water, on defendants' lands. All that is shown is that plaintiffs cleaned out Kingfisher Slough at intervals, and made ditches to drain their own lands, none of which led directly to defendants' lands. There is no artificial channel in this case, and thus *Minton v. Steakley*, 466 S.W.2d 441 (Mo.App. 1971), is distinguishable. What was there involved was an *artificial* drainage district ditch. At page 444[1], the court recognized that a prescriptive easement may accrue in artificial channels if they are enjoyed by an upper proprietor for the statutory period of limitation.

All the facts here, considered by the trial court in ruling the motion for summary judgment, show that all defendants did was to construct their dike to ward off surface water from their lands. Although this did cause water to stand south of the dike and extend to plaintiffs' lands, it was dead surface water. None was caused to flow over plaintiffs' lands in the opposite direction. None was "cast" upon those lands, and none caused any washing of their lands. Under all the pleadings and the evidence adduced, the trial court did not err in entering summary judgment against plaintiffs upon their claims for damages.

The judgment is affirmed.

All concur.