Greg **KLOKKENGA**, Appellant,

v.

Gerald **CAROLAN**, et al, **Respondents**.

No. WD 65861.

Missouri Court of Appeals,
Western District.

June 27, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 2006.

Application for Transfer Denied
Sept. 26, 2006.

Andrew Farwell, Kirksville, for Appellant.

David Thrift Butsch and Joe Jacobson, Clayton, for Respondent.

RONALD R. HOLLIGER, Judge.

Greg Klokkenga appeals a judgment of the Circuit Court of Schuyler County finding in favor of Gerald and Karen Carolan in his judge-tried civil suit against the Carolans. Among other things, in his petition, Mr. Klokkenga sought an award of money damages to him, as well as an order requiring the Carolans to remove certain obstructions from a claimed "natural waterway" that Klokkenga alleged caused excess water to collect and remain upon his property. Finding no error, we affirm the judgment.

### Facts and Procedural History

As found by the trial court and supported by other evidence presented at trial, the facts and procedural history of this case are as follows.[1] Mr. Klokkenga and

---

1. We agree with the Carolans that the statement of facts in Mr. Klokkenga's brief is inaccurate because in large part, he repeatedly presents as fact the evidence he offered in support of his case at trial, rather than the facts as found by the trier of fact or that otherwise appear in the record and support the judgment. Accordingly, pursuant to Rule

Mr. Carolan are farmers and adjoining property owners in rural northeast Missouri. All of the property within the area of their dispute is in the Chariton River bottom.[2] In general, water drains very slowly from north to south in this area, which is extremely flat.[3] Historically, excess surface water in the area has presented problems for all property owners in their efforts to cultivate their property.

Mr. Klokkenga owns 140 acres of real estate located in Schuyler County, which he purchased from Herman Fountain, Jr., and Connie Fountain in 2002. However, the only piece of land owned by Klokkenga which is relevant to this case is Tract A, a forty-acre plot. Tract A lies directly south of a county road running east and west and is located directly north of "Tract C," an adjoining forty-acre tract owned by the Carolans.[4] A berm separates Tract A from Tract C, and extends to the east and west of "Point B."

Located directly south of Tract C is another forty-acre tract, which is owned by Paul and Linda Lay and is located in Adair County.[5] The Carolans also own a large amount of property to the south of the Lay's property. This property is located in Adair County as well. The property line separating the Lays' forty-acre tract

from the Carolans' southern acreage is marked by a half-mile long levee running east and west, which was present when Gerald and James Carolan originally acquired the property in 1974. In 1988, Mr. Carolan increased the height of the levee by approximately one foot to its current height of about five feet, closed a "free flow opening" in the levee that was about ten feet wide with fill dirt, and installed a fifteen-inch diameter drainage tube located at Point E to allow water to drain from the north side of the levee to the south side of the levee.

In 1983 and 1984, drainage ditches were constructed on that portion of Mr. Lay's property located in the same general area as Tracts A and C. These ditches run in a north-south direction. Despite the presence of these drainage ditches, Mr. Lay described the property generally as a wetland, where standing water is present most of the time, as did Mr. Carolan, who characterized it as a marshy, wet area, both before and after the fifteen-inch drainage tube was installed at Point E. For the past ten years, Mr. Lay has used the property to pasture livestock.

As noted *supra*, before Mr. Klokkenga purchased it in 2002, Tract A was owned

84.04(f), the Carolans provided a helpful supplementary statement of facts to correct the material misstatements in Mr. Klokkenga's brief.

2. To aid in the reader's comprehension of the layout of the various properties and the other land features involved here, the Appendix to this opinion includes a rough map of the area introduced at trial, which, although not entirely accurate in every detail, is still quite helpful.

3. The elevation of the land in the area of this dispute decreases from north to south, but only very gradually. Just north of the Schuyler County road that runs along the northern boundary of "Tract A," the elevation is ap-

proximately 779 feet above sea level, while at "Point E," which is located approximately three-quarters of a mile south of the northern boundary of Tract A, the elevation is about 773 feet.

4. Mr. Carolan acquired this property with his brother James in 1974. In 2003, James Carolan conveyed his interest in the property to Gerald Carolan, and it is now owned by Gerald and his wife Karen.

5. The property line comprising the southern border of Tract C and the northern border of this tract is the Adair County–Schuyler County line. The Lays also own the property located directly east of this tract, as well as the property immediately to the east of Tract C.

by the Fountains. Historically, Tract A was not cultivated for farming purposes, but was used primarily as pasture land. Around 1994, Mr. Fountain constructed what is commonly known to farmers as a "W-ditch" and tried to grow crops on Tract A. The W-ditch runs generally from the northwest to the southeast and consists of two parallel channels approximately two and a half feet deep and ten feet wide at the bottom. The southern terminus of the channels is near the property line separating Tract A from Tract C. While Mr. Fountain was successful in raising some crops in the southeast portion of the property at some point after digging the W-ditch, the southwest portion of Tract A was a "natural pond" unsuitable for farming. No crops were grown on Tract A until sometime after Mr. Fountain dug the W-ditch because the ground was generally too wet to support crops.

In prior litigation in 2000 (case number CV300–45CC), Mr. Fountain sued the Carolans in the Circuit Court of Schuyler County for crop damage on Tract A, which was allegedly caused by the presence of excess surface water on that property. The case was settled on the day trial was scheduled to occur via a handwritten "Stipulation & Agreement" which provided, in its entirety:

The parties stipulate & agree as follows:

1. Plaintiff [Mr. Fountain] will construct a ditch across the SE corner of the Jr. Fountain tract (marked 'Tract A' on Exhibit A which is the attached aerial photograph, which is hereby incorporated herein by this reference), described as the NE ¼ [of the] SW ¼ [of] Section 14 T[ownship] 64 R[ange] 16, Schuyler County, Missouri, said ditch to commence approximately 10′ west of the existing drainway (marked 'B' on the attached) as the drainway exits Tract A onto the Carolan tract (Tract C attached) described as the SE ¼ [of the] SW ¼ [of] Section 14 T[ownship] 64 R[ange] 16, Schuyler County, Missouri, said ditch to run thence generally easterly along the borders of Tracts A & C and located half on Tract A and half on Tract C until it reaches the east border of Tracts A & C, at which point it turns south, located entirely on Tract C and continue on the East border of Tract C until it joins an existing drainway (marked 'D' on attached) which runs generally southeast along land owned by Clifford Lay.

2. The ditch will be a 10 foot flatbottom ditch, with minimum 3″ per 100 foot drop and estimated w/o assuring to be approximately 3–4′ deep at the NE corner of Tract C where it meets the aforementioned SE corner of Tract A.

3. Both parties have the right of ingress and egress onto the property of the other in order to maintain the ditch.

4. Defendants [the Carolans] will pay plaintiff the sum of $525.00 for constructing the ditch.

5. Parties hereby dismiss all pending claims without prejudice, costs to be shared equally.

The settlement agreement was signed by counsel for the parties (but not the parties themselves). Although this document was filed with the trial court and Mr. Fountain's lawsuit was voluntarily dismissed without prejudice, the "Stipulation & Agreement" was not signed by the trial judge in case number CV300–45CC, was not entered as an order or judgment of the court on the record in the case, and was not filed in the public real estate records of Schuyler County.

Mr. Klokkenga was not a party to the Fountain–Carolan lawsuit, nor was he a party to or signatory of the settlement agreement. In fact, Mr. Klokkenga did not actually see that document until approximately one month after he had purchased Tract A from the Fountains. Furthermore, when Mr. Klokkenga bought Tract A from Mr. Fountain, they did not enter into any agreement assigning Mr. Fountain's rights under the settlement agreement to Mr. Klokkenga. The drainage ditch was never dug because Mr. Fountain "just never did get around to it" before selling Tract A to Mr. Klokkenga in 2002, and the Carolans never paid Mr. Fountain the promised $525 since the ditch was never constructed by Mr. Fountain.

In January 2003, Mr. Carolan improved the existing berm on the property line between Tracts A and C. He increased the height of the berm, filled in a gap located at Point B, extended the berm to the northeast corner of Tract C, and then further extended it due south along the eastern boundary of Tract C.

Count I of Mr. Klokkenga's Second Amended Petition for Damages, which was filed in September 2003, alleged that the written "Stipulation & Agreement" described *supra* was "entered by the [Circuit] Court as a judgment on March 2, 2001" in case number CV300–45CC and constituted a covenant or easement which was intended to "run with the land" and was, therefore, enforceable by Mr. Klokkenga against the Carolans. Count I of the petition also alleged that the Carolans had breached that covenant and were also in contempt of the circuit court's alleged "judgment" of March 2, 2001, in that they had refused to allow Mr. Klokkenga to construct the drainage ditch referred to in the "Stipulation & Agreement," and that they had constructed a levee to the south of Tract A "which obstructs the natural flow of water, and which will cause water to back up" onto Tract A. Mr. Klokkenga sought the entry of an order requiring the Carolans: (1) to show cause why they had refused to comply with the alleged "judgment" of March 2, 2001; (2) to grant Mr. Klokkenga the right of ingress and egress to Tract C to construct and maintain the drainage ditch referred to in the settlement agreement; (3) to pay Mr. Klokkenga $525 once the ditch was completed; and (4) to remove the levee at Point E.

In Counts II and III, the petition alleged that flooding caused by the Carolans killed Mr. Klokkenga's crops located on Tract A and prevented him from farming said property. In particular, Mr. Klokkenga alleged that in constructing the levee at Point E, the Carolans caused Tract A to be flooded by obstructing "the natural flow of water" from north to south through what Klokkenga characterized as a "natural waterway,"[6] resulting in the artificial impoundment and collection of surface water on Tract A. Mr. Klokkenga requested an award of money damages to compensate him for the loss of his crops and the use of Tract A for farming operations, as well as an order requiring the Carolans "to remove the levee obstructing the waterway at point 'E'" and "to allow the construction of the ditch as agreed upon in the stipulation and agreement of March 2, 2001."

Both parties presented the testimony of expert witnesses, who reached different conclusions as to the predominant causes of the surface water problems in the region and the best way to solve them. Mr.

6. Starting from Tract A, the alleged "natural waterway" enters Tract C at Point B and runs through the northeast corner of Tract C, exiting Tract C at Point D. After continuing through Mr. Lay's property, it finally enters the Carolans' southernmost property at Point E, ultimately heading south and west toward the Chariton River.

Klokkenga testified that because it obstructs the "natural waterway" running through Tract A into Tract C at Point B, the berm causes standing water to back up onto his property (Tract A), resulting in at least four acres of crops being killed in a normal year and at least ten acres of crops being killed in a wet year. Furthermore, despite the fact that the levee at Point E is located a half-mile south of Mr. Klokkenga's property (Tract A), at trial, Mr. Klokkenga testified that after substantial rains, excess surface water will collect beginning at Point E and continuing northward all the way up the "natural waterway" to his property, eventually flooding up to an additional twelve acres on Tract A. He also presented evidence that the flooding on Tract A would best be remedied by requiring the Carolans to remove the berm at Point B, the levee at Point E, and certain piles of dirt obstructing the "natural waterway" just south of Point B. Meanwhile, the Carolans presented evidence that the installation of the drainage tube and the closing of the free flow opening in the levee at Point E created a crossing allowing Mr. Carolan to gain access to his southernmost fields in Adair County, and that the levee protects approximately 100 acres of Mr. Carolan's southern cropland from flooding.

The trial court entered its Findings of Fact, Conclusions of Law and Judgment on March 15, 2005, denominating the judgment as final for purposes of appeal under Rule 74.01(b) on August 5, 2005.[7] The court found against Mr. Klokkenga and in favor of the Carolans on all of Klokkenga's claims. As to Count I, the trial court determined that since no judgment was ever entered of record in case number CV300–45CC, which was dismissed without prejudice, "no judgment exists for which the [Carolans] may be found in contempt." Furthermore, the court found that because: (1) Mr. Klokkenga was not in any way a party to the settlement agreement; (2) neither Mr. Fountain nor Mr. Carolan had signed the settlement agreement; (3) the settlement agreement was never filed of record in the public real estate records of Schuyler County and Mr. Klokkenga never even saw it until after he had already purchased Tract A from Mr. Fountain; and (4) the terms of the settlement agreement did not contain sufficient indicia of intent to show that the parties to that agreement intended it to be a covenant or easement running with the land; it "cannot be construed to be covenant running with the land which would be enforceable by [Mr. Klokkenga]."

As to Counts II and III, the trial court applied the reasonable use doctrine applicable to surface water drainage disputes as announced by the Missouri Supreme Court in *Heins Implement Co. v. Missouri Highway & Transportation Commission*, 859 S.W.2d 681 (Mo. banc 1993), ruling that the Carolans' actions in maintaining the berm at Point B and the levee at Point E were not unreasonable because they substantially benefited the Carolans and only

---

7. In part, the Rule 74.01(b) certification was necessary since Mr. Klokkenga sued not only Gerald and Karen Carolan, but also James Carolan. We are not concerned with James Carolan in this appeal. Nor are we concerned with the Carolans' third-party claims against Schuyler County, the Fountains, Clifford and Carolyn Lay, and Paul and Linda Lay, or Paul and Linda Lay's third-party counterclaims against Gerald, Karen, and James Carolan, which were evidently tried separately. The only judgment the trial court denominated as final under Rule 74.01(b) for purposes of this appeal was the one which denied all of Mr. Klokkenga's claims against Gerald and Karen Carolan and also denied Gerald and Karen Carolan's counterclaim against Mr. Klokkenga. The Carolans have not cross-appealed the denial of their counterclaim against Mr. Klokkenga.

minimally damaged Mr. Klokkenga.[8] This appeal followed.

## Standard of Review

As acknowledged by the parties in their briefs, appellate review of this court-tried civil matter is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), under which "[t]his court will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Dorman v. Dorman*, 91 S.W.3d 167, 169 (Mo.App. W.D.2002). "Our primary concern is the correctness of the trial court's judgment, not the route it took to get to that result, and therefore, we will affirm the judgment if it is supported by any reasonable theory, even if different from that expressed by the trial court." *Stadium West Props., L.L.C. v. Johnson*, 133 S.W.3d 128, 132 (Mo.App. W.D.2004) (internal quotation marks omitted). Moreover, "[t]his court views the evidence and all reasonable inferences therefrom in the light most favorable to the judgment and disregards all contrary evidence and infer-

ences." *Dorman*, 91 S.W.3d at 169. Furthermore, as in all judge-tried civil cases, the "credibility of the witnesses and the weight to be given their testimony are matters for the trial court, which is free to believe none, part, or all of the testimony." *Norris v. Nationwide Mut. Ins. Co.*, 55 S.W.3d 366, 369 (Mo.App. W.D.2001). An appellate court not only "defers to a trial court's ability to determine the witnesses' credibility," but also to its ability "to choose between conflicting evidence." *In the Interest of A.H.*, 9 S.W.3d 56, 59 (Mo. App. W.D.2000).

## Analysis

In his second point relied on, Mr. Klokkenga asserts that the trial court erred as a matter of law in denying him relief on Counts II and III because "Missouri law does not allow a natural watercourse to be obstructed and any party that obstructs a natural watercourse incurrs [sic] liability for all damage caused therefrom" in that he proved that the Carolans obstructed a "natural watercourse" at Points B and E. We disagree.

---

**8.** We note that nowhere in Count II or III of Mr. Klokkenga's Second Amended Petition did he mention the existence of the berm at Point B or allege that he had been damaged as a result of excess surface water caused by the Carolans' maintenance of the berm. Nor did the petition make any specific demand for injunctive relief or damages resulting from the blockage of an alleged "natural watercourse" with respect to the berm at Point B. Instead, the petition focused on the Carolans' actions with regard to the levee at Point E. For these reasons, the Carolans urge us to ignore all of Mr. Klokkenga's points as they relate to the berm, arguing that "the trial court could not have erred in not providing Klokkenga with relief he never requested with respect to the berm at 'Point B.' " However, as noted *supra*, Mr. Klokkenga did present a substantial amount of evidence relating to the berm at trial (including evidence of damages and the need for the Carolans to remove all

man-made obstructions to the flow of water through the alleged "natural waterway"), none of which was objected to by the Carolans as raising issues beyond the scope of the pleadings. Furthermore, in its judgment on Count I, the trial court correctly observed that Mr. Klokkenga had sought, in the alternative, the court's entry of an order requiring the Carolans "to remove obstructions and allow the water to flow naturally." As to this issue, the court ruled, *inter alia*, that "the granting of such relief [would not] be reasonable under the circumstances presently existing." Therefore, for the purpose of this appeal, we will treat all such issues with regard to the berm as having been tried by the implied consent of the parties as though they had been raised in the pleadings. *See Rule 55.33(b); Heins*, 859 S.W.2d at 685; *Helterbrand v. Five Star Mobile Home Sales, Inc.*, 48 S.W.3d 649, 655–56 (Mo.App. W.D.2001).

As demonstrated by the argument section of his brief, the sole basis for Mr. Klokkenga's assertion is the Southern District's opinion in *Dudley Special Road District v. Harrison*, 517 S.W.2d 170 (Mo.App. 1974). In *Dudley,* the court noted:

The term "natural watercourse" has been defined as follows: "There must be a stream usually flowing in a particular direction, though it need not flow continually. It must flow in a definite channel, having a bed, sides or banks, and usually discharge itself into some other stream or body of water. It must be something more than a mere surface drainage over the entire face of a tract of land, occasioned by unusual freshets or other extraordinary causes. It does not include the water flowing in the hollows or ravines in land, which is the mere surface water from rain or melting snow, and is discharged through them from a higher to a lower level, but which at other times are destitute of water. Such hollows or ravines are not in legal contemplation water courses."

*Id.* at 175 (quoting *Happy v. Kenton,* 362 Mo. 1156, 247 S.W.2d 698, 701 (1952), which in turn quoted the even older case of *Benson v. Chicago & Alton R.R. Co.,* 78 Mo. 504, 514 (1883)).

The court in *Dudley* proceeded to hold that as the waterway in question there (a stream known as Lick Creek) was a "natural watercourse" as defined in *Happy,* "it was unlawful for the defendants to have obstructed it so as to cause the waters of it to overflow, encroach upon and inflict damage to the land of plaintiffs. This is true without regard to the quality of the conduct which caused that obstruction, that is, whether intentional, negligent, or non-negligent." *Id.* at 175–76 (citing *Kelso v. C.B.K. Agronomics,* 510 S.W.2d 709, 719 (Mo.App.1974)). The court went on to elucidate the reason for this rule of strict liability as follows:

"Liability for damages for causing the overflow of the waters of a natural watercourse by reason of an obstruction is not based upon intention to obstruct the water (except in the rare case of a malicious intent to injure the property of another). Nor is the mere impounding of water the foundation of the action. The basis of liability is the fact that the obstruction causes the water to overflow, encroach upon and inflict special damage to the property of another. It is the impounding of the waters to such an extent that an overflow occurs and a trespass results—a wrongful act—which fixes liability. Whether the impounding of the waters is intentional or accidental, whether the overflow is caused by negligence or without negligence, the agency obstructing the flow and causing the overflow of the waters of a natural watercourse to the damage of adjacent property owners is liable for its misfeasance in an action of trespass." ...
When the trial court had properly determined that Lick Creek was a natural watercourse providing a continuing function in carrying off water from the lands of the plaintiffs, it could properly issue a mandatory injunction requiring a removal of the obstruction which was placed there by defendants and which was impairing that function.

*Id.* at 176 (quoting *Corrington v. Kalicak,* 319 S.W.2d 888, 894 (Mo.App.1959)).

Relying on *Dudley,* Mr. Klokkenga reasons that inasmuch as he presented evidence at trial that the drainway between his property and the Chariton River qualifies as a "natural watercourse," any actions taken by the Carolans which "obstructed it so as to cause the waters of it to overflow, encroach upon and inflict damage to" his land were unlawful, thereby entitling him

to an award of damages and injunctive relief. *See Dudley,* 517 S.W.2d at 175–76.

■■■ There are several serious problems with this reasoning, not the least of which is that the trial court did *not* find that the drainway between his property and the Chariton River was a "natural watercourse" under *Dudley.* In fact, Mr. Klokkenga clearly failed to prove that the drainway was a natural watercourse at all, because a natural watercourse "is a living stream of water with well defined banks, and a channel and bed. Such a stream to be a watercourse need not run continuously, *but it must be fed from other and more permanent sources than mere surface water.*" *Roberts v. Hocker,* 610 S.W.2d 321, 326 (Mo.App. W.D.1980) (emphasis in original); *see also Senkevech v. Vaughn,* 610 S.W.2d 399, 402 (Mo.App. W.D.1980) (holding that a slough or ravine through which water flowed in rainy or flood times was not a "natural watercourse" as defined in *Dudley* ). Indeed, surface waters may have "banks or a bed; the contour of the topographical features of the land itself constitute the 'channel' within which the surface water flow is contained." *Roberts,* 610 S.W.2d at 326. For this reason, "[t]he mere incidence of a channel for the surface water ... does not establish a watercourse. There must be evidence that such a ditch is fed by a permanent source of water." *Haith v. Atchison County,* 793 S.W.2d 151, 155 (Mo.App. W.D.1990) (internal citation and quotation marks omitted). Here, however, just as in *Haith,* "[s]uch evidence is lacking." *Id.* Moreover, Missouri courts have recognized that a "common method for defense against *surface water* is the construction of dams, dikes or berms." *Id.* at 154 (emphasis added).

In *Heins Implement Co. v. Missouri Highway & Transportation Commission,* 859 S.W.2d 681 (Mo. banc 1993), the Missouri Supreme Court abrogated the "common enemy" doctrine and adopted in its place the "rule of reasonable use" for disputes involving surface waters, thereby "chang[ing] the analysis with regard to claims based on diversion of surface water." *Thomas v. City of Kansas City,* 92 S.W.3d 92, 98 (Mo.App. W.D.2002).

From at least 1884 until *Heins* was decided, the so-called "common enemy" doctrine was applied in Missouri. *Heins,* 859 S.W.2d at 686.[9] Over the years, however, appellate courts often applied the common enemy rule in different ways, created exceptions to it, and frequently disagreed on the scope of the exceptions, *id.* at 686–87, resulting in a rule which contained a "labyrinth of exceptions" and was "unduly complicated and confusing and threatened arbitrary and unjust results," *id.* at 690–91. Recognizing these problems, the Court in *Heins* concluded in 1993 that prior surface water case precedents could no longer be reconciled, *id.* at 687, and that the common enemy rule had outlived its usefulness, *id.* at 690–91. Therefore, *Heins* rejected the common enemy doctrine in favor of the rule of reasonable use. *Id.* at 689–91.

■■■ "The rule of reasonable use does not lay down any specific rights or privileges regarding surface waters, but leaves

---

9. "This doctrine held that surface water was a common enemy to all landowners; thus, he or she was allowed to guard against it in his or her own way. *Abbott v. Kansas City, St. Joseph & Council Bluffs R.R. Co.,* 83 Mo. 271, 283–86 (1884); *Grant v. St. Louis, Iron Mountain & S. Ry. Co.,* 149 Mo.App. 306, 130 S.W. 80, 81 (1910). As such, when a landowner improved his or her property, he or she was not responsible for damages to the neighbor's land by reason of the fact that surface water might thereby have been turned upon his or her neighbor, so long as the improvements were done in a 'proper manner.' " *Id. Bettinger v. City of Springfield,* 158 S.W.3d 814, 818 n. 3 (Mo.App. S.D.2005).

each case to be decided on its own facts in accordance with 'principles of fairness and common sense.' " *Bettinger,* 158 S.W.3d at 818 (quoting *Heins,* 859 S.W.2d at 689); *see also Thomas,* 92 S.W.3d at 98 (noting that "[t]he rule of reasonable use does not purport to lay down specific rights with respect to surface waters."). The thrust of the reasonable use rule states that " 'each possessor [of land] is legally privileged to make a reasonable use of his land, even though the flow of surface water is altered thereby and causes harm to others, but incurs liability when his harmful interference with the flow of surface waters is unreasonable.' " *Heins,* 859 S.W.2d at 689 (quoting *Armstrong v. Francis Corp.,* 20 N.J. 320, 120 A.2d 4, 8 (1956)). Under *Heins,* "[l]iability for surface water flow arises when the defendant's conduct regarding surface water is (1) intentional and unreasonable, or (2) negligent, reckless, or in the course of an abnormally dangerous activity." *Bettinger,* 158 S.W.3d at 818 (citing *Heins,* 859 S.W.2d at 689–90). Simply stated, the reasonable use rule imposes "a duty upon any landowner in the use of his or her land not to needlessly or negligently injure by surface water adjoining lands owned by others, or in the breach thereof to pay for the resulting damages." *Heins,* 859 S.W.2d at 690. Whether a landowner's actions in altering the flow of surface water is a reasonable use of his or her property is "a question of fact, to be determined in each case by weighing the gravity of the harm to the plaintiff against the utility of the defendant's conduct." *Id.* at 689; *see also Robinson v. Mo. State*

*Hwy. & Transp. Comm'n,* 24 S.W.3d 67, 75 (Mo.App. W.D.2000) (holding that the reasonableness of a landowner's redirection of surface waters by means of a levee presented a question of fact).

With this in mind, we now consider Mr. Klokkenga's argument. He takes the position that the *Heins* case and the reasonable use rule adopted by it do not apply here, claiming that "[t]he 'reasonable use' caveat of surface water law is not applicable when the drainway is considered a natural watercourse." We need not resolve that issue because the evidence presented at trial supports the trial court's implicit finding that this case involves surface water, not a natural watercourse.[10]

Indeed, "[t]he Supreme Court of Missouri adopted the reasonable use surface water rule in 1993 for the avowed purpose of 'bringing into one classification all waters over the use of which controversy may arise,' " *Bettinger,* 158 S.W.3d at 820 (quoting *Heins,* 859 S.W.2d at 691), and "to make the law governing controversies over water uniform since the rights of users of other waters in Missouri are governed by the rule of reasonable use." *Campbell v. Anderson,* 866 S.W.2d 139, 144 (Mo.App. W.D.1993) (citing *Heins,* 859 S.W.2d at 691). Accordingly, this court has held:

> The rule of reasonable use makes obsolete the negligence and trespass nomenclature in cases involving the diversion of surface waters, because the concepts of negligence and trespass are merged into, and made subject to, the rule of

10. In its judgment, the trial court noted that Mr. Klokkenga's cause of action in Counts II and III involved a private nuisance theory, which "rests upon tort liability for unreasonable interference with use and enjoyment of land," and proceeded to analyze those claims under the reasonable use doctrine adopted in *Heins.* This was entirely correct, because "[i]n *Heins,* the Supreme Court held that sur-

face water rights and liabilities were not to be analyzed exclusively as property law questions, but were to be analyzed as a form of nuisance. Under *Heins,* upper and lower landowners are to be treated alike and all questions of liability for actions taken with regard to surface water are to be analyzed under a reasonableness standard." *Thomas,* 92 S.W.3d at 98 (internal citation omitted).

reasonable use. An attempt to plead a cause of action as to surface water flooding must plead the elements of unreasonable use.

*Thomas,* 92 S.W.3d at 98; *see also Bettinger,* 158 S.W.3d at 819 (noting that the pre-*Heins* cases cited by the appellant "and [the] cases cited therein, as well as the language used, no longer have relevancy. This follows because the common enemy rule was at issue in [those cases] and that rule was displaced via *Heins.*")

In *Heins,* our Supreme Court stated that "[t]he greatest virtue of the reasonable use standard is its ability to adapt to any set of circumstances while remaining firmly focused on the equities of the situation," 859 S.W.2d at 690, further observing that "its simplicity of concept will allow for a more flexible and sure application to the many factual situations that inevitably will arise." *Id.* at 691. As in *Bettinger,* the issue presented in Mr. Klokkenga's Point II is "whether the surface water rule of law adopted in *Heins* governed here. This was a question of law which the trial court correctly decided adversely to Plaintiffs." *Bettinger,* 158 S.W.3d at 820–21. Therefore, we hold that the trial court properly rejected the strict liability test urged by Mr. Klokkenga and did not err in employing the *Heins* test to determine whether the Carolans were liable for their actions in maintaining the berm at Point B and the levee at Point E.[11] Point denied.

In his first point relied on, Mr. Klokkenga argues that the trial court erred in denying him relief on Counts II and III because the Carolans acted unreasonably in maintaining the berm at Point B and the

levee at Point E in that they dammed a natural drainway, recklessly causing continual flooding of Tract A and in that the harm to Mr. Klokkenga outweighed the utility of the Carolans' conduct. Once again, we disagree.

In the argument section of his brief corresponding to this point, Mr. Klokkenga contends the trial court committed three errors in finding the Carolans' actions to be reasonable. First, he contends the trial court erred in not recognizing "that Missouri surface water law does not allow the obstruction of a natural drainway." However, in our analysis of his second point *supra,* we have already concluded that this argument is meritless, as this case does not involve the obstruction of a natural watercourse.

Second, Mr. Klokkenga argues that although it "may not be applicable," section 244.010, RSMo 2000, should be considered in this appeal as indicative of the General Assembly's "desire to promote the quick and efficient drainage of surface water." However, section 244.010 "has no application to the facts of this case," as it "provides only that an owner of swamp, wet, flat or overflowed land may construct open ditches, tiles or levees to drain or protect it, and the owner must pay the value of land of another only over which the works are constructed." *Senkevech,* 610 S.W.2d at 403; *see also Dodge v. Millard,* 580 S.W.2d 558, 560 (Mo.App. E.D. 1979) (noting that under section 244.010, "the owner or owners of 'wet' or 'flat' farmlands shall have the right to drain such land by constructing ditches across the land of another, where necessary, pro-

---

11. Some courts have applied the reasonable use test to determine liability even in cases involving the obstruction or blockage of a natural watercourse. *See, e.g., Locklin v. City of Lafayette,* 7 Cal.4th 327, 27 Cal.Rptr.2d 613, 867 P.2d 724, 743 (1994) (noting, in this context, that " 'so far as a similarity of benefits and injuries exists, there should be a similarity in the rules of law applied.' ") As observed *supra,* however, we need not decide whether *Heins* implicitly overruled cases such as *Dudley.*

vided that the owners of any land so utilized are compensated for the land consumed by the drainage construction."). In particular, Missouri appellate courts have held that section 244.010, which has been in continuous effect in one form or another since 1885, *Young v. Moore,* 241 Mo.App. 436, 236 S.W.2d 740, 743–44 (1951), "does not do away with a landowner's rights" under Missouri common law governing the redirection of surface waters, *Senkevech,* 610 S.W.2d at 403, and "does not confer rights any broader than those conferred by the general law." *Minton v. Steakley,* 466 S.W.2d 441, 444 (Mo.App.1971). Therefore, the statute is simply irrelevant to this case.

■ Third, Mr. Klokkenga contends the trial court erred because the Carolans "failed to present evidence [that their] actions were reasonable" and also "failed to present evidence that the utility of [their] actions outweighed the harm caused to" Mr. Klokkenga. As noted *supra,* however, the trial court's determination that the Carolans' conduct was reasonable is a finding of fact, and thus can only be set aside if it is unsupported by substantial evidence or is against the weight of the evidence. As to this issue, the trial court ruled:

> The levee ... exists at a location approximately one-half mile south of the southernmost border of [Mr. Klokkenga's] property. It is unclear from the evidence precisely what portion of the damage claimed by [Mr. Klokkenga] is a result of the levee at Point E ... versus the berm ... along Point B.... In any event, the gravity of the harm suffered by [Mr. Klokkenga] as a result of water standing on his property results in the loss, in a wet year, of up to 10 acres of real estate. The 10 acres of real estate is property that historically was not used for crop production and, most importantly, at the time the levee was im-

proved by [Mr. Carolan] in 1988, was and had historically been pasture ground. The efforts from the construction of the [levee] in 1988 by [Mr. Carolan] resulted in approximately 100 acres of [Mr. Carolan's] crop ground being protected from flooding. Thus, the utility of [Mr. Carolan's] conduct was substantial.... Thus, the Court finds that [Mr. Carolan's] improvements to the [levee] in 1988 and installation of the 15–inch tube was not an unreasonable use of his land, as it results in substantial benefit to [Mr. Carolan] while causing relatively minimal damage to [Mr. Klokkenga]. Thus, the [levee] located between the Carolan and Lay property is not in violation of the reasonable use doctrine.

This ruling was supported by substantial evidence presented at trial, much of which has already been described above. In addition, Mr. Klokkenga himself testified that the excess surface water on Tract A flows south around the berm when ten acres of ground are covered by water, thus setting the maximum limit of flooding on his property. Of those ten acres, four acres appear always to be covered by water. Mr. Klokkenga testified: "Well, it just backs up, you know, in between there, four to ten acres."

Nevertheless, Mr. Klokkenga points to his testimony that after substantial rains, excess surface water will collect beginning at the levee at Point E and continuing northward all the way up the claimed "natural waterway" to his property, eventually flooding up to 12 more acres on Tract A. However, since the "credibility of the witnesses and the weight to be given their testimony are matters for the trial court, which is free to believe none, part, or all of the testimony," *Norris,* 55 S.W.3d at 369, and we defer to the trial court's ability "to choose between conflicting evidence,"

*A.H.,* 9 S.W.3d at 59, the trial court was not obliged to credit that testimony, particularly since the levee at Point E is located a half-mile south of Tract A and there was no evidence that such flooding also affected Tract C, which is also located to the south of Tract A. Thus, the trial court could reasonably have concluded that the balance of utility and harm favored Mr. Carolan, who testified that he would lose 100 acres of his southernmost farmland if the berm and levee were removed.[12] Accordingly, the trial court did not err in finding that the Carolans' use of their land, and in particular their conduct with respect to the berm at Point B and the levee at Point E protecting their southern farm acreage from flooding due to excess surface water, was reasonable, and that the balance of the utility and harm of their actions did not give rise to any liability. Point denied.

In his third and final point, Mr. Klokkenga claims the trial court erred in ruling that the settlement agreement between the Carolans and Mr. Fountain was not enforceable by Mr. Klokkenga since it was not a covenant running with the land. Like points I and II, this point is not well taken.

 As to Mr. Klokkenga's claim in his second amended petition that the Carolans were in contempt of the circuit court's alleged "judgment" of March 2, 2001, the trial court found:

> A review of the previous litigation filed by Herman Fountain, Jr. against Carolan in the Circuit Court of Schuyler County, Missouri, Case No. CV300–45CC, reveals that no judgment was ever entered in that case. The docket entry entered by Judge Karl DeMarce on March 2, 2001, states, in part: "Parties file stipulation and agreement pursuant to which all pending claims are dismissed without prejudice. Costs are to be borne equally by the parties." No docket entries designated as a judgment nor formal entry of a judgment is contained. Therefore, no judgment exists for which [the Carolans] may be found in contempt.

In his brief, Mr. Klokkenga presents no arguments whatsoever to the contrary and has, therefore, abandoned that claim on appeal. *See Gilbert/Robinson, Inc. v. Sequoia Ins. Co.,* 655 S.W.2d 581, 582 (Mo. App. W.D.1983).

This leaves only Mr. Klokkenga's claim that the handwritten "Stipulation & Agreement" of March 2, 2001, between the Carolans and Mr. Fountain is enforceable against the Carolans by Mr. Klokkenga since it was a covenant "running with the land." As noted *supra,* under the terms of that agreement, Mr. Fountain agreed to dig a ten foot wide, flat-bottom drainage ditch along a specified course, part of which was on Tract A and part of which was on Tract C. The Carolans were to pay Mr. Fountain the sum of $525.00 when the drainage ditch was completed, and the parties granted the rights of ingress and egress onto the property of the other in order to maintain the ditch. The parties also agreed to dismiss all pending claims against each other without prejudice, with costs to be shared equally. The drainage ditch was never dug because Mr. Fountain "just never did get around to it" before selling Tract A to Mr. Klokkenga in 2002, and the Carolans never paid Mr. Fountain the promised $525.00 since the ditch was never constructed by Mr. Fountain.

---

**12.** Actually, Mr. Carolan's testimony at trial was that if the berm or the levee were removed or modified as requested by Mr. Klokkenga, the resulting excess surface water would destroy about *200* acres of his farmland. The trial court obviously exercised its prerogative to believe only part of this testimony.

As to the issue of an enforceable covenant, the trial court made the following relevant findings and conclusions:

> [T]he "Stipulation and Agreement" referred to by [Mr. Klokkenga] is not signed by either of the property owners in question. Neither Mr. Fountain, who was then the owner of Tract A, nor Carolan, the owner of Tract C, executed the agreement.... [Mr.] Klokkenga is not in any fashion a party to the "Stipulation and Agreement." The terms of the stipulation and agreement do not contain sufficient indicia that the parties intended the same to be an easement or covenant running with the land. The document in question ... was never filed of record in the real estate records of Schuyler County, Missouri, and [Mr. Klokkenga] did not see the document until after he purchased the property. Thus, this Court finds that the "Stipulation and Agreement" ... cannot be construed to be a covenant running with the land which would be enforceable by [Mr. Klokkenga].

These findings and conclusions are supported by substantial record evidence and do not erroneously declare or apply the law of this state.

■ "A covenant is simply an agreement between the grantor and grantee which requires the performance or the nonperformance of some specified duty with regard to real property, including an agreement to do or not to do a particular act." *Whispering Valley Lakes Improvement Ass'n v. Franklin County Mercantile Bank,* 879 S.W.2d 572, 574 (Mo.App. E.D.1994). There are two types of covenants: personal covenants, which do not run with the land; and real covenants, which do. "Personal covenants are 'personal' promises made by grantor and grantee generally concerning the use of the land. The personal covenants do not 'run with the land....'" *Lake Wauwanoka, Inc. v. Spain,* 622 S.W.2d 309, 312 n. 6 (Mo.App. E.D.1981); *see also Hall v. Am. Oil Co.,* 504 S.W.2d 313, 317 n. 3 (Mo.App. 1973) (noting that such covenants "are personal regarding the use or restriction upon the land between the grantor and grantee, not attaching to the land"); *Miller v. Noonan,* 12 Mo.App. 370, 373 (1882), *aff'd,* 83 Mo. 343 (1884) (noting that when "the covenants are personal, [they] do not run with the land."). On the other hand, "[a] covenant is viewed as real in nature, or one that runs with the land, when either the liability to perform the duties therein enumerated or the right to take advantage thereof passes to the vendee or other assignee of the land." *Kerrick v. Schoenberg,* 328 S.W.2d 595, 600 (Mo.1959) (internal quotation marks omitted). Of course, "a subsequent grantee of the land may sue the original covenantor upon any covenant that runs with the land." *Baird v. Harris,* 220 Mo.App. 1290, 290 S.W. 80, 81 (1927).

■ As did the trial court, in determining the type of covenant at issue here, we must ascertain the mutual intent of the parties thereto as expressed by its plain language, without resorting to parole evidence of that intent:

> It is well established that courts should interpret covenants so as to give effect to the intent expressed by the plain language. Parole evidence attempting to establish the intent of the parties to a covenant is neither binding as a matter of law nor usually admissible. Parole evidence cannot be used to vary or contradict the terms of an unambiguous and complete written instrument.[13]

---

**13.** While the trial court permitted Mr. Klokkenga to adduce various such parole evidence of intent at trial (all of which he refers to in

*Parkton Ass'n v. Armstrong,* 878 S.W.2d 50, 53–54 (Mo.App. E.D.1994) (internal citations omitted). Here, as in *Parkton,* "[t]he language of the covenants before the trial court was clear. The intent of the parties can be determined from the plain language." *Id.* at 54.

■ The settlement agreement contains three related agreements, the first of which was a temporary license allowing Mr. Fountain to enter upon the Carolans' property to construct a drainage ditch, which was to expire once Mr. Fountain had finished constructing the ditch. This license was also personal to Mr. Fountain, since the settlement agreement provides that he was the only one authorized by the Carolans to construct the ditch. Because this was only a temporary, personal license, it does not constitute a permanent right of entry that runs with the land. *See Williams v. Beatty,* 139 Mo.App. 167, 122 S.W. 323, 326 (1909) (holding that a landowner's grant of a written but unrecorded personal license to another person to construct a drainage ditch on the landowner's property "was not a covenant running with the land, nor did it constitute an incumbrance").

■ Second, the settlement agreement contains reciprocal or cross-easements between Mr. Fountain and the Carolans allowing them to enter each other's property to maintain the ditch *once it had been constructed.* However, those easements obviously did not become effective until and unless Mr. Fountain constructed the ditch. It does not make sense to suggest that easements which never actually came into being somehow run with the land, and Mr. Klokkenga cites no authority holding otherwise.

Third, the settlement agreement evidences contractual obligations on the part of Mr. Fountain to construct the ditch as specified in the agreement, and on the part of the Carolans to pay Mr. Fountain the sum of $525.00 once he finished doing so. Mr. Fountain's obligation to construct the ditch was personal to him, and the Carolans' obligation to pay him the $525.00 did not arise unless and until Mr. Fountain constructed the ditch. Both are clearly only personal contractual obligations, not permanent encumbrances upon the land.

■ Furthermore, when Mr. Klokkenga bought Tract A from Mr. Fountain, they did not enter into any agreement assigning Mr. Fountain's rights under the settlement agreement to Mr. Klokkenga. Meanwhile, while a covenant need not explicitly recite that its obligations are to run with the land or be binding on all subsequent purchasers or grantees, *Wheelock v. Gibson,* 744 S.W.2d 464, 466 (Mo.App. W.D.1987); *Kerrick,* 328 S.W.2d at 601, the settlement agreement itself shows no mutual intent that it was entered into "not only for the benefit and to the burden of the parties signatory, but also expressly for the benefit and to the burden of" the future owners of Tracts A and C. *Rosenbloom v. Grossman,* 351 S.W.2d 735, 739 (Mo.1961). Therefore, the mutual intention of the parties to the settlement agreement to bind their heirs and assigns does not clearly appear. *See id.*

Additionally, it is logical to presume, as did the trial court, that the legal title holders of the property, which was intended to be the subject of a written real covenant running with the land, would execute the agreement themselves rather than employing proxies to do so, even those as trusted as their attorneys. Finally, the settlement agreement was never filed of record in the real estate records of Schuyler County, Missouri, as would naturally be

his brief), it did not rely on this evidence in

rendering its judgment. Neither will we.

expected if the parties thereto had intended its duties and liabilities to pass to subsequent grantees of the land, and impart public notice to them. *See, e.g., Bremen Bank & Trust Co. v. Muskopf,* 817 S.W.2d 602, 608 (Mo.App. E.D.1991) ("Once recorded, notice is imputed to all persons and subsequent purchasers."); *Hall,* 504 S.W.2d at 317 (observing that upon the recordation of a covenant, all persons "are presumed to have constructive notice of its existence and would be bound thereby").

Nevertheless, without citing any pertinent authority, Mr. Klokkenga insists that the settlement agreement is a real covenant running with the land and that he has the right to enforce the settlement agreement against the Carolans.[14] However, in light of the language of the agreement and the circumstances discussed *supra,* it makes no sense to insist that any of the inchoate personal rights referred to in the settlement agreement, having never matured or come into being since Mr. Fountain never constructed the ditch before selling Tract A to Mr. Klokkenga in 2002, are somehow perpetual features of the property enforceable by a non-party to the agreement, particularly since the agreement was entered into mainly in consideration for dismissal of all pending claims Mr. Fountain and the Carolans had against each other, with costs to be shared equally. Rather, they were merely "collateral undertaking[s], personal in nature, and contractual, relating to the consideration[.]" *Mo. Home Sav. & Loan Ass'n v. Allen,* 452 S.W.2d 109, 112 (Mo.1970) (internal quotation marks omitted). In short, the settlement agreement at issue here "does not belong to the class of covenants which run with the land"—rather, "[i]t is purely a personal and collateral covenant." *Sturgeon v. Schaumburg,* 40 Mo. 482, 485 (1867). Therefore, we hold that the trial court did not err in determining that the terms of the Fountain–Carolan "Stipulation & Agreement" did not contain sufficient indicia that they intended it to be a real covenant running with Tracts A and C, enforceable by subsequent purchasers such as Mr. Klokkenga. In fact, "the plain language of the covenant indicates an intention of its creators that it should be a personal covenant as opposed to a real covenant." *Kling v. Taylor–Morley, Inc.,* 929 S.W.2d 816, 819 (Mo.App. E.D.1996). Point denied.

The judgment is affirmed.

---

**14.** None of the half-dozen or so cases cited by Mr. Klokkenga in his brief stand for the proposition that a settlement agreement entered into between two parties to a lawsuit relating to their land becomes a real covenant running with the land absent any evidence that the parties intended such a result.

## APPENDIX

VICTOR C. HOWARD, Presiding Judge, and LISA WHITE HARDWICK, Judge, concur.